857 F.2d 913
 28 ERC 1797, 57 USLW 2179, 18 Envtl.
L. Rep. 21,303
 J. FILIBERTO SANITATION, INC., Appellant,
v.
STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION
and Board of Public Utilities; Hunterdon County
Municipal Utilities Authority.
 No. 88-5046.
 United States Court of Appeals,
Third Circuit.
 Argued July 11, 1988.
Decided Sept. 8, 1988.
 
 Robert S. Moraff (argued), Steven T. Singer, Schwartz, Tobia & Stanziale, Montclair, N.J., for appellant.
 W. Carey Edwards, Atty. Gen. of New Jersey, Michael R. Clancy, Harley A. Williams (argued), Deputy Atty. Gen., Trenton, N.J., for appellees, State of N.J., Dept. of Environmental Protection and Board of Public Utilities.
 Gaetano M. De Sapio, John P. Gallina (argued), Flemington, N.J., for appellee, Hunterdon County Utilities Authority.
 Before SLOVITER, SCIRICA and WEIS, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 Appellant J. Filiberto Sanitation is a New Jersey Corporation engaged in the collection and disposal of solid wastes, registered and licensed as a public utility. See N.J.Stat.Ann. Sec. 48:2-13 (West Supp.1988). Appellees the New Jersey Department of Environmental Protection (DEP) and the New Jersey Board of Public Utilities (BPU) are state agencies with regulatory authority over aspects of the collection and disposal of solid waste. Appellee Hunterdon County Municipal Utilities Authority (Authority) is a public body created by the Hunterdon County Board of Freeholders pursuant to the New Jersey Municipal and County Utilities Authorities Law, N.J.Stat.Ann. Secs. 40:14B-1 et seq. (West 1967 & Supp.1988), to participate in the implementation of the county's Solid Waste Management Plan.
 
 
 2
 Under a regulation promulgated pursuant to the New Jersey Solid Waste Management Act, all trash collected in Hunterdon County must be deposited at the Authority's transfer station for processing and subsequent disposal. Filiberto, which wishes to continue to transport the waste it collects in Hunterdon County directly to out-of-state landfills for final disposal, challenges the regulation under the dormant Commerce Clause.I.
 
 Background
 A.
 The Regulatory Scheme
 
 3
 New Jersey's Solid Waste Management Act, N.J.Stat.Ann. Secs. 13:1E-1 to 1E-198 (West 1979 and Supp.1988) (the Act), sets forth a comprehensive waste management program founded on the determination that "collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest." Id. Sec. 13:1E-2(a).
 
 
 4
 The Act gives the DEP responsibility for promulgating and updating a statewide solid waste management plan. Id. Sec. 13:1E-6a(3). Each county in New Jersey is designated as a solid waste management district with the responsibility of developing a district solid waste management plan based on state guidelines. Id. Sec. 13:1E-19 to -21, -23. No plan may be adopted without a public hearing and the opportunity for written comment. Id. Sec. 13:1E-23. Upon adoption, a district plan must be reviewed and approved by the DEP. Id.
 
 
 5
 The BPU's role is to "assess and regulate the economic aspects of the solid waste disposal industry." A.A. Mastrangelo, Inc. v. Commissioner of Dep't Envtl. Protection, 90 N.J. 666, 681, 449 A.2d 516, 524 (1982). Under the Act, it must review the "economic aspects" of a district's plan. N.J.Stat.Ann. Sec. 13:1E-24. Only the BPU has the power to establish franchises for solid waste collection and disposal and to set the rates haulers may charge their customers for such services. Solid Waste Utility and Control Act, N.J.Stat.Ann. Secs. 48:13A-4 to -5 (West Supp.1988); see Mastrangelo, 90 N.J. at 681-82, 449 A.2d at 524. To some extent, the roles of each of the two agencies verge upon the other. As the New Jersey Supreme Court has explained, the DEP has the general authority to assess solid waste flow needs and to direct one district to dispose of its waste in another, but only the BPU has the power to "direct individual solid waste collectors to collect and transport waste ... to specific disposal sites and require or designate specific disposal facilities as the ultimate destination of particular waste streams." Id. at 686, 449 A.2d at 526-27.
 
 B.
 The Hunterdon County Plan
 
 6
 Hunterdon County has the obligation under the Act to plan disposal of the approximately 80,000 tons of solid waste it generates each year. The affidavit filed in this case by the Director of Solid Waste for the County of Hunterdon explains the problem facing the Authority in implementing its statutory obligation. At the time the Plan was developed, there was no facility at which solid waste could be disposed of in Hunterdon County. In addition, "[t]here are few available landfills left in the State. Only a few counties are developing new ones. Resource recovery facilities ... [e.g. trash to steam] have been talked about but only a couple of counties have developed them." App. at 24. She further explained that "disposal opportunities in the Northeastern United States are scarce. More and more landfill operators are selective about what waste they accept and upon what terms." App. at 31.
 
 
 7
 Hunterdon County's Plan was adopted and approved by the DEP in 1979, as modified in 1981. The Plan mandated construction of a transfer station and originally provided that county trash could be deposited there for compacting and subsequent transport by the transfer station's operator to the Warren County site for ultimate disposal. The "key ingredient" of the Plan was an Interdistrict Waste Agreement with Warren County, approved by the DEP, under which Warren would, until at least 2005, accept all of Hunterdon's trash for processing at its planned trash-to-steam plant. App. at 27. As an interim measure, Warren County also agreed to accept all of Hunterdon County's trash at its landfill pending completion of the plant.
 
 
 8
 The Hunterdon County Plan was amended in 1984, following the required public hearing and the approval of the DEP and the BPU, by adoption of a Rule requiring most types of solid waste generated in Hunterdon County to be deposited only at the transfer station.[1] This Rule, codified at N.J.Admin.Code tit. 7, Sec. 7.26-6.5(k)(3), became effective on October 7, 1985, and is the regulation attacked in this case.
 
 
 9
 The County entered into a contract with Browning-Ferris Industries to operate the transfer station, which opened in August 1985. The operation, including the cost of final disposal elsewhere, was to be financed by "tipping fees", the rates charged haulers who deposit waste at the station. The tipping fees were to be set by the Authority, to which the County had delegated general responsibility for the complete operation and administration of all financial aspects of the station.
 
 
 10
 In 1983, before the transfer station was completed, the Warren County landfill was closed by the DEP. The DEP authorized Hunterdon haulers to haul their waste for disposal to a facility in Ocean County, and also allowed them the option of arranging disposal with private landfills in Pennsylvania. Although the transfer station had been constructed in anticipation of the disposal of all of Hunterdon County's trash at the planned Warren County trash-to-steam plant, DEP announced in 1985 that Warren's trash production was such that Warren would not be able to accommodate all of Hunterdon's trash. A new Interdistrict Waste Agreement was negotiated under which Warren would accept 30,000 tons per year from Hunterdon for ten years once the trash-to-steam plant commenced operation. This was a "put or pay" agreement, whereby Hunterdon would be required to pay for the reserved capacity "irrespective of whether it delivers the waste." App. at 29-30.
 
 
 11
 During the first twenty months that the transfer station operated, it disposed of the waste it compacted at the Keystone Landfill in Pennsylvania. In April of 1987, the Pennsylvania authorities ordered Keystone to reduce the volume of waste accepted. Keystone then declined further contributions from Hunterdon. Browning-Ferris immediately found alternative sites, including the GROWS landfill in Pennsylvania, but because this entailed increased costs, the Authority increased the tipping fees from approximately $40/ton to more than $125/ton (although the price was lowered the next month to $100/ton).[2]
 
 
 12
 Despite the Rule requiring haulers picking up trash in Hunterdon to deposit that trash at the transfer station, Filiberto deposited no trash at the station between August 1985, when the station opened, and April 1987. Apparently, although the record is not clear, it was transporting the bulk of the waste it collected directly to the Keystone Landfill. When Keystone closed, Filiberto contracted to deliver waste directly to GROWS Landfill in Pennsylvania at a rate it asserts in its complaint was approximately half the station's tipping fee, despite the fact that the station's waste also ended up at the GROWS disposal site.
 
 C.
 Proceedings
 
 13
 On May 29, 1987, the DEP issued an Administrative Order requiring Filiberto to dispose of all solid waste it collected in Hunterdon at the transfer station, and its request for a stay was denied. On September 10, 1987, Filiberto initiated this action.[3] Its complaint, in five counts, filed in federal court on the basis of 28 U.S.C. Sec. 1331 and 28 U.S.C. Sec. 1337, sought declaratory and injunctive relief on the theories that the Rule requiring haulers to use the transfer station and the Administrative Order against it were unconstitutional and in violation of the New Jersey Antitrust Act.
 
 
 14
 Defendants moved for summary judgment, with supporting affidavits. Neither side sought discovery. Filiberto filed no response to the motion and no motion pursuant to Fed.R.Civ.P. 56(f) stating that it needed discovery to respond to the motion.
 
 
 15
 The district court, stating that the Rule "does not discourage the interstate transportation of solid waste," App. at 169, and "appears to be nothing more than an integral part of a state objective to insure the safe and efficient disposal of solid waste," App. at 170, held that the Rule did not violate the Commerce Clause. It granted summary judgment to the defendants on the constitutional claims and dismissed the state antitrust claims. App. at 170. This appeal followed.[4] We have plenary review over the grant of summary judgment. See Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
 
 II.
 Jurisdiction
 
 16
 New Jersey argues that the district court did not have jurisdiction of Filiberto's complaint because this is "essentially a case in which the nominal plaintiff [Filiberto], fearing an action by the State of New Jersey to enforce the State's waste flow regulation, beat the State in a race to the courthouse and set forth in its complaint its federal defense to the State's anticipated state-law complaint." Appellee New Jersey's Brief at 11.
 
 
 17
 The case on which it relies most strongly, Exxon Corp. v. Hunt, 683 F.2d 69 (3d Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983), does not mandate dismissal of Filiberto's suit. In Hunt, various corporations sued for a declaratory judgment, contending that the New Jersey Spill Compensation and Control Act, which required them to pay a state tax, had been rendered "unconstitutional and preempted" by the federal Superfund Act. We affirmed the district court's dismissal of the suit under the Tax Injunction Act. Id. at 72. In addition, in reliance on Allegheny Airlines, Inc. v. Pennsylvania Public Utils. Comm'n, 465 F.2d 237, 241 (3d Cir.1972), cert. denied, 410 U.S. 943, 93 S.Ct. 1367, 35 L.Ed.2d 609 (1973), we stated that "a declaratory judgment complaint does not state a cause of action arising under federal law when the federal issue is in the nature of a defense to a state law claim." Hunt, 683 F.2d at 73.
 
 
 18
 There is no bright line defining when a claim is "in the nature of a defense to a state law claim." However, nothing in either Hunt or Allegheny derogates from the force of Ex parte Young's holding that federal courts may enjoin enforcement of unconstitutional state laws, 209 U.S. 123, 160-62, 28 S.Ct. 441, 454-55, 52 L.Ed. 714 (1908). Recently, in Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Court reaffirmed the Ex parte Young rule, stating that "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." Id. at 96 n. 14, 103 S.Ct. at 2899 n. 14. It explained the application of the well-pleaded complaint rule in Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), as depending on the fact that the plaintiff there was "seeking a declaration that state laws were not pre-empted" by federal law. Shaw, 463 U.S. at 96 n. 14, 103 S.Ct. at 2899 n. 14. A noted commentator interprets Shaw and Franchise Tax Board as adopting an interpretation of the well-pleaded complaint rule under which "an action by the state cannot be removed, but the party challenging state regulation may himself bring an action in federal court." 13B Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3566 at 100-102 (2d ed. 1984); see also Note, Federal Jurisdiction Over Declaratory Suits Challenging State Action, 79 Colum.L.Rev. 983, 999-1000 (1979). Thus, we reject the state's argument that the district court had no subject matter jurisdiction.
 
 III.
 Discussion
 A.
 The Crisis
 
 19
 The New Jersey Supreme Court has found in an unrelated test of Act regulations, that the disposition of solid waste has been in a state of crisis since the mid-seventies, and continues to be "one of this state's most severe problems." A.A. Mastrangelo, Inc. v. Commissioner of Dep't of Envtl. Protection, 90 N.J. 666, 670-71, 449 A.2d 516, 518-19 (1982). Filiberto has not disagreed. Expressions of serious concern by legislators, citizens and the press are pervasive. See, e.g., Public Hearing Before the Senate Energy and Environment Committee on S-1478 (Statewide Mandatory Recycling), 202d N.J.Leg., 2d Sess. (Hackensack, Feb. 13, 1986); The Garbage Crisis, Newark Star-Ledger, Aug. 11, 1987, at 14, col. 1 (editorial); see also Public Meeting Before Assembly Select Committee on Solid Waste Disposal, Assembly Bill 3892, 202d N.J.Leg., 2d Sess. (Trenton, Mar. 30, 1987) (bill authorizing DEP to implement emergency plans on behalf of counties during a declared state of solid waste emergency); McGarrity, State Waste Disposal Praised, N.Y. Times, May 22, 1988, Sec. 12NJ, at 19, col. 1 (New Jersey currently in solid waste crisis but leading nation in finding solutions to problem). See generally State of New Jersey, County and Municipal Government Study Commission, Solid Waste Management in New Jersey (1987) (comprehensive report on crisis and state and local government response).
 
 
 20
 The state's continuing concern with the problem is exemplified by the recent introduction of the nation's first statewide mandatory recycling program, 1987 N.J.Sess.Laws ch. 102, at 196 (West) (codified in scattered sections of N.J.Stat.Ann. Sec. 13:1E (West Supp.1988)); see Dewling, Earth Day's Vision: A Long Way to Go, N.Y. Times, May 17, 1987 Sec. 11NJ, at 34 col. 1, intended "to reduce the amount of solid waste which is disposed of in the State," Senate Revenue, Finance and Appropriations Committee Statement, 1987 N.J.Sess.Laws ch. 102, at 257, as well as by the enactment of a provision to provide an economic incentive to municipalities to host transfer stations, see 1987 N.J.Sess.Laws ch. 449, at 306 (West) (codified as N.J.Stat.Ann. Sec. 13:1E-28.1 (West Supp.1988)) (guaranteeing economic benefit of at least $0.50/ton of solid waste accepted for transfer to municipalities in which transfer stations are located).
 
 
 21
 Solid waste is more than a problem for the state of New Jersey; it is also an article of interstate commerce. City of Philadelphia v. New Jersey, 437 U.S. 617, 621-23, 98 S.Ct. 2531, 2534-35, 57 L.Ed.2d 475 (1978). Filiberto's contention that the Rule mandating use of the transfer station violates the Commerce Clause requires us to apply teachings of the Supreme Court which "through the years have reflected an alertness to the evils of 'economic isolation' and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a state legislates to safeguard the health and safety of its people." Id. at 623-24, 98 S.Ct. at 2535; see, e.g., Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (states retain authority under general police powers to regulate matters of "legitimate local concern" despite effect on interstate commerce); Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 36-37, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980) (same); see also Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 398 (3d Cir.1987) ("legislation in areas of peculiarly strong state interest is subject to very deferential review" under Commerce Clause).
 
 B.
 The Issue
 
 22
 If the Rule is merely an exercise in protectionism, either in purpose or effect, it is subject to heightened scrutiny, Oberly, 822 F.2d at 400, and will almost certainly be held invalid, see, e.g., Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986); Philadelphia v. New Jersey, 437 U.S. at 624-28, 98 S.Ct. at 2535-38.
 
 
 23
 If, however, the Rule is genuinely aimed at the legitimate goal of alleviating a trash crisis, and seeks to achieve that goal by means that do not transfer the burden of the solution onto out-of-state interests, it is subject to the balancing test of Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under this analysis, the Rule would be invalid "only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits." Oberly, 822 F.2d at 398-99; accord Brown-Forman, 476 U.S. at 579, 106 S.Ct. at 2084.
 
 
 24
 The Supreme Court has recognized that no clear line may be drawn between the category of regulation subject to per se invalidation and the category reviewable under the Pike balancing test. Id.; see Oberly, 822 F.2d at 400 & n. 18. It is clear, however, and for purposes of this case dispositive, "that, ordinarily, it is those measures that are discriminatory which are the focus of the Commerce Clause" American Trucking Ass'ns, Inc. v. Larson, 683 F.2d 787, 791 (3d Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982); accord CTS Corp. v. Dynamics Corp., 481 U.S. 69, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987) ("The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce."); see, e.g., New Energy Co. v. Limbach, --- U.S. ----, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988); Maine v. Taylor, 477 U.S. at 138, 106 S.Ct. at 2448; Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).[5]
 
 
 25
 All burdens placed on interstate commerce are not discriminatory, see Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978), but discrimination may not be deemed absent simply because a regulation applies to in-state as well as out-of-state interests, see Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 350-52, 97 S.Ct. 2434, 2445-46, 53 L.Ed.2d 383 (1977). The essential question is whether the challenged regulation confers an advantage upon in-state economic interests--either directly or through imposition of a burden upon out-of-state interests--vis-a-vis out-of-state competitors. See New Energy Co., 108 S.Ct. at 1807.
 
 
 26
 As the party attacking the statute, Filiberto bears the burden of showing discrimination. See Hughes, 441 U.S. at 336, 99 S.Ct. at 1736. On defendants' motion for summary judgment, Filiberto therefore had the obligation to make a showing sufficient to establish the existence of discrimination. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
 
 C.
 The Per Se Invalidity Rule
 
 27
 Filiberto, arguing that "[t]he sole purpose of the Rule is to attempt to guarantee a generous profit to the transfer station operators when direct hauling by [Filiberto] and others would clearly be less expensive to the rate payers of Hunterdon County," Appellant's Brief at 24, analogizes the in-state compacting requirement to mandatory in-state processing. It thus argues that we should find the Rule per se invalid under the line of decisions beginning with Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928), and proceeding through the plurality opinion in South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), which held that states may not protect in-state economic interests by requiring processing in-state that would be more economically carried out outside. See Pike, 397 U.S. at 145, 90 S.Ct. at 849 ("[T]he Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate interest, this particular burden on commerce has been declared to be virtually per se illegal.").
 
 
 28
 The discrimination prohibited by these cases was the state's direct interference with the market either for the purpose or with the effect of favoring home-state interests against out-of-state competitors. In Pike, for example, the Court held that the Commerce Clause prohibited the state from requiring an in-state producer to process its melons in-state, at an added cost of approximately $200,000, rather than at its processing facility across the state border. 397 U.S. at 144-45, 90 S.Ct. at 848-49. Similarly, in Toomer v. Witsell, the Court invalidated a South Carolina law that required shrimp caught in its waters to be unloaded and packed in its own ports, explaining that "an inevitable concomitant of a statute requiring that work be done in South Carolina, even though that be economically disadvantageous to the fishermen, is to divert to South Carolina employment and business which might otherwise go to [another state]; the necessary tendency of the statute is to impose an artificial rigidity on the economic pattern of the industry." 334 U.S. 385, 403-04, 68 S.Ct. 1156, 1166, 92 L.Ed. 1460 (1948).
 
 
 29
 Filiberto has failed to make a showing that the Rule requiring processing of trash at the transfer station was protectionist in purpose. It has rested on the bare allegations of its complaint, while the uncontested affidavits of the defendants show that the Rule serves numerous legitimate, non-protectionist purposes.
 
 
 30
 Theresa Martin, Director of Solid Waste for Hunterdon County, averred that the Rule served to assure that all trash produced within the county is properly disposed of; reduce truck traffic on county roadways; give the county an accurate gauge for planning purposes of the amount of waste generated; allow the county to enter into and meet long- and short-term contracts for final disposal, which are typically on a put-or-pay basis; and assure that all haulers, many of whom lack equipment for long-distance hauling, have a practical outlet for trash as distance to landfills grows. Gilbert Mueller, Principal Planner of New Jersey DEP, Division of Solid Waste Management, gave two basic purposes for waste flow regulations, including the Rule: "First, and most important, [such regulations] rationally and efficiently organize the collection and disposition of solid waste in the State.... Second, they discourage illegal dumping by directing waste flows to prescribed disposal sites." App. at 48. Mueller stated that transfer stations allow trash to be compacted for long-distance transport and afford reasonable stability in waste disposal for counties with limited or no disposal facilities, putting them in "a far better position to enter into long term multiple contracts with disposal facilities out-of-state." App. at 46-47.
 
 
 31
 The absence of a demonstrated discriminatory purpose is not necessarily fatal to Filiberto's case, however, for "the evil of protectionism can reside in legislative means as well as legislative ends." Philadelphia v. New Jersey, 437 U.S. at 626, 98 S.Ct. at 2536-37. Indeed, the Pike Court explained that discriminatory processing requirements are virtually per se invalid "[e]ven where the State is pursuing a clearly legitimate local interest." 397 U.S. at 145, 90 S.Ct. at 849. Once Filiberto failed to show a discriminatory purpose, it would have had to show that the Rule, whatever its purpose, effected some discrimination against out-of-state economic interests in order to fall under the per se invalidity rule of the processing cases. This it has failed to do.
 
 
 32
 One of the principal functions of the transfer station is the compacting of trash to allow its efficient long-distance transport to landfills. In performing this function, the station is not in competition with out-of-state landfills. On the contrary, the station is their customer.
 
 
 33
 To the extent that the transfer station garners for itself all of the county's trash for disposal at a landfill, an activity previously performed by haulers, the effect falls equally on in-state as well as out-of-state haulers operating in Hunterdon County. In Oberly, this court stated that the Supreme Court "has found facially evenhanded legislation to have discriminatory effect only where the state law advantages in-state business in relation to out-of-state business in the same market." 822 F.2d at 402; see also New Energy Co., 108 S.Ct. at 1807. See generally Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich.L.Rev. 1091, 1095 (1986) ("[N]ot just any purpose to advantage local economic actors at the expense of foreign actors is protectionist. The purpose must be to advantage local actors at the expense of their foreign competitors.").
 
 
 34
 Furthermore, the Rule is triggered by the origin of the waste, and is blind to the origin of the hauler. In Harvey & Harvey v. Delaware Solid Waste Auth., 600 F.Supp. 1369, 1380 (D.Del.1985), District (now Circuit) Judge Stapleton rejected an attack on a Delaware scheme requiring all solid waste generated in the state to be disposed of at approved sites within the state. There as here, "[t]he only significant economic burden emphasized in the complaint and the briefing is a burden on in-state collectors, like the plaintiffs, who will be required to pay higher disposal fees for the disposal services which [the legislature] has found to be essential to the health and well being of [state] residents." Id.
 
 
 35
 The only allegation of economic injury under the Commerce Clause in Filiberto's complaint is that it (and by implication its customers) must pay twice as much to tip garbage at the transfer station as at the GROWS landfill. App. at 6-10. We find Filiberto's claims in this respect to be very much like those of the petitioners in Exxon Corp. v. Maryland, who asserted in the course of their Commerce Clause attack on a statute prohibiting petroleum producers or refiners from operating retail service stations in Maryland, that the law would interfere with the interstate market by "weakening" some firms and would also injure the public by eliminating some low-cost dealers. 437 U.S. at 127-28, 98 S.Ct. at 2214-15. The Court rejected the "underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market." Id. at 127, 98 S.Ct. at 2215. It explained that any injury to in-state consumers "relates to the wisdom of the statute, not to its burden on commerce." Id. at 128, 98 S.Ct. at 2215. We note also the well-established maxim of Commerce Clause jurisprudence that the existence of substantial in-state interests harmed by a regulation is "a powerful safeguard" against legislative discrimination. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 473 n. 17, 101 S.Ct. 715, 728 n. 17, 66 L.Ed.2d 659 (1981); accord South Carolina State Highway Dep't v. Barnwell Bros., Inc., 303 U.S. 177, 187, 58 S.Ct. 510, 515, 82 L.Ed. 734 (1938).
 
 
 36
 It is precisely the evident fact that the Rule places the burden of alleviating the trash problem upon New Jersey residents that makes this case unlike Philadelphia v. New Jersey, where the Supreme Court held that a state law barring all out-of-state trash from state landfills was invalid because "it impose[d] on out-of-state commercial interests the full burden of conserving the State's remaining landfill space." 437 U.S. at 628, 98 S.Ct. at 2537. As the Court has subsequently explained, "out-of-state residents were forced to bear the brunt of the conservation program for no apparent reason other than that they lived and voted in other States." Maine, 477 U.S. at 148 n. 19, 106 S.Ct. at 2453 n. 19.
 
 
 37
 Finally, Filiberto has shown "no demonstrable effect whatsoever on the interstate flow of goods." Exxon, 437 U.S. at 126 n. 16, 98 S.Ct. at 2214 n. 16. It is undisputed that trash from the station is now sent to the same out-of-state landfill where Filiberto wishes to dump. Even if the transfer station selected a different landfill, the absence of any New Jersey landfill possibility shown by the affidavits in this record makes it inevitable that the transfer station's trash will flow into interstate commerce, just as that trash did before the adoption of the Rule. See Exxon, 437 U.S. at 126-27 n. 16, 98 S.Ct. at 2214 n. 16 ("[Gas] sales by independent retailers are just as much a part of the flow of interstate commerce as the sales made by the refiner-operated stations").
 
 
 38
 Therefore, we reject Filiberto's contention that the Rule is per se invalid under the Commerce Clause.
 
 D.
 The Balancing Test
 
 39
 The "balancing test" which has evolved permits courts to strike down a statute that regulates "evenhandedly" and imposes merely "incidental burdens" on interstate commerce only if the court finds that "the burden imposed on such commerce" clearly exceeds the local benefits. Pike, 397 U.S. at 142, 90 S.Ct. at 847. Under this court's precedent, the only burdens which implicate the Commerce Clause in the balancing analysis are those that discriminate against interstate commerce. See Oberly, 822 F.2d at 406; Larson, 683 F.2d at 798-99. Once it is clear no such discrimination has been alleged, "the inquiry as to the burden on interstate commerce should end." Id. at 799.
 
 
 40
 Although Filiberto has shown no cognizable burdens on interstate commerce from the Rule requiring processing of trash at Hunterdon's transfer station and thus we need not engage in the balancing test, we nonetheless note that the local benefits of the Rule are substantial. The transfer station is the county's only disposal facility. As such it is irreplaceable. As a centralized depository, it is the basis of the county's ability to plan and execute long- and short-term disposal arrangements. As such, it is indispensable. On the record before us, there can be no doubt that the transfer station could not adequately perform these functions without the Rule, and that the Rule therefore directly promotes the county's effective response to the crisis in solid waste management.
 
 
 41
 Filiberto argues that the nature of the balancing test is such that it was error for the district court to decide the motion on the record as it stood. We have previously rejected Filiberto's implicit suggestion that a Commerce Clause claim acts to suspend the normal rules of civil procedure. In Oberly, we held that a plaintiff could not escape summary judgment merely by claiming that, given an opportunity to produce evidence at a hearing, it could demonstrate that the statute it attacked was animated by a discriminatory purpose. See Oberly, 822 F.2d at 403. Furthermore, it has long been the law of this court that once the allegations of the complaint have been met by the affidavits of the defendants, "[t]he challenge which these facts call for if there is to be a genuine issue is not met by a simple reference to the complaint." Robin Constr. Co. v. United States, 345 F.2d 610, 614 (3d Cir.1965); accord Fed.R.Civ.P. 56(e).
 
 
 42
 Filiberto failed to utilize Fed.R.Civ.P. 56(f)[6] to explain by affidavit why it needed discovery. See Dowling v. City of Philadelphia, 855 F.2d 136, 139-40 (3d Cir.1988); Mid-South Grizzlies v. National Football League, 720 F.2d 772, 780 n. 4 (3d Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). Even now, when questioned at oral argument as to what discovery would be relevant to the constitutional issue, its counsel was unable to identify any meaningful discovery which would create a material issue of fact. Under these circumstances, we hold that the district court did not act precipitously in ruling on the summary judgment motion.
 
 IV.
 Conclusion
 
 43
 In its motion for summary judgment, defendants brought forward by affidavit sufficient material to make a showing that the Rule was, both in purpose and in effect, a proper exercise of the state's authority to protect the welfare of its citizenry which placed no cognizable burden on interstate commerce. In response, Filiberto stood on its complaint. As a consequence, there is no genuine issue of fact on the issue of discrimination, a fundamental element of Filiberto's case, and one upon which it would bear the burden at trial. The district court therefore did not err in granting summary judgment for the defendants, and its decision will be affirmed.
 
 
 
 [1]
 "All solid waste types 10, 13, 23, 25 and 27 generated from within Hunterdon County municipalities shall be transported to the Hunterdon County transfer station ... prior to disposal...." N.J.Admin.Code tit. 7, Sec. 7:26-6.5(k)(3). The covered types of solid waste include household, commercial and institutional municipal waste; bulky waste such as appliances and tree trunks; vegetative waste from farms, nurseries and greenhouses; animal and food processing waste; and dry industrial waste. Id. tit. 7, Sec. 7:26-2.13(g)
 
 
 [2]
 In the immediate aftermath of Keystone's loss, the collection of trash in Hunterdon County and the operation of the transfer station were to some degree suspended, both because of the lack of any final disposal site and the vastly increased tipping fee. The haulers, the Authority and the BPU cooperated to expedite a rate increase for the haulers, whose rates are regulated, and to afford credit at the transfer station in the meantime. App. at 33. Filiberto was among those haulers seeking rate relief. App. at 34. Rate relief was granted by the BPU on April 9. There is an immaterial dispute concerning why and for how long the station was closed during this period. Compare App. at 34 with App. at 5-6
 
 
 [3]
 That same day, the state attempted to file an enforcement complaint in the Chancery Division of the Superior Court, but was unable to do so owing to a procedural defect. The complaint was subsequently refiled, and a consent order was issued. Under the order, which is subject to change based on the outcome of this appeal, Filiberto agreed to comply with the Rule. State of New Jersey DEP v. J. Filiberto Sanitation, Inc., No. C-7560-87 (N.J.Super.Ct.Ch.Div. May 24, 1988)
 
 
 [4]
 Filiberto does not raise any issue on appeal with respect to the dismissal of its state antitrust claims
 
 
 [5]
 Also subject to invalidation under the Commerce Clause are "statutes that adversely may affect interstate commerce by subjecting activities to inconsistent regulations." CTS, 107 S.Ct. at 1649 (citing cases). Filiberto does not contend that this rule is implicated here
 In emphasizing the discrimination element of Commerce Clause analysis, we take no position in the debate over whether discrimination is the evil, or a measure of the evil, the clause is supposed to alleviate. Compare Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich.L.Rev. 1091, 1094 (1986) (clause forbids protectionism directed by one state against another), cited with approval in id. at 1648, with Eule, Laying the Dormant Commerce Clause to Rest, 91 Yale L.J. 425, 428 (1982) (clause best understood to protect democratic process from evisceration by state parochialism).
 
 
 [6]
 Fed.R.Civ.P. 56(f) provides:
 Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or make such other order as is just.