770 F.Supp. 775 (1991)
STEPHEN D. DeVITO, JR. TRUCKING, INC.
v.
The RHODE ISLAND SOLID WASTE MANAGEMENT CORPORATION and Thomas E. Wright in his capacity as Executive Director of the Rhode Island Solid Waste Management Corporation.
Civ. A. No. 91-0307-T.
United States District Court, D. Rhode Island.
July 22, 1991.
*776 *777 R. Daniel Prentiss, Providence, R.I., for plaintiff.
Robert G. Flanders, Jr., John D. Deacon, Daniel J. Schatz, Providence, R.I., for defendant.

MEMORANDUM AND ORDER
TORRES, District Judge.
This is an action to declare void a regulation of the Rhode Island Solid Waste Management Corporation ("RISWMC") requiring that all solid waste originating or collected within the State of Rhode Island be disposed of at state-licensed facilities (i.e. facilities in Rhode Island) and to enjoin RISWMC from enforcing that requirement. Stephen D. DeVito, Jr. Trucking, Inc. ("DeVito") contends that the regulation violates the Commerce Clause of the United States Constitution, Article I, § 8, Clause 3. The case is presently before the Court for decision on the plaintiff's motion for a preliminary injunction.

FACTS
RISWMC is a public corporation created by an act of the Rhode Island General Assembly. See R.I.Gen.Laws § 23-19-6 (1989). Although not a department of state government, RISWMC has broad powers and responsibilities regarding regulation of the collection, transportation and disposal of solid waste in Rhode Island. Pursuant to those powers and responsibilities, it operates a facility known as the Central Landfill ("CLF") which, for all practical purposes, is the only licensed facility in Rhode Island for the disposal of commercially generated solid waste.[1]
DeVito is a Massachusetts corporation engaged in the business of hauling solid waste. DeVito does not ultimately dispose of the waste it collects, but a significant portion of its business consists of making arrangements to dispose of that waste at licensed disposal facilities, a service that is included in the fees DeVito charges its customers.
Until June 3, 1991, DeVito transported approximately 400 tons per day of solid waste generated in Rhode Island to licensed waste-to-energy facilities located in Massachusetts and Maine where it was burned to produce electricity. The "tipping" fees charged by those facilities for acceptance of the solid waste were considerably less than the $49 per ton charged for commercial waste by RISWMC at CLF.[2] By passing a portion of that savings on to its customers, DeVito was able to attract a significant amount of business from Rhode Island companies.
On May 22, 1991, RISWMC adopted a resolution directing that, effective June 1, 1991, all solid waste originating or collected in Rhode Island be disposed of at facilities licensed by the Rhode Island Department of Environmental Management ("DEM"). On June 3, 1991, RISWMC adopted an emergency resolution promulgating flow control regulations formalizing that requirement and providing for penalties *778 against those delivering solid waste for disposal at facilities not licensed by DEM and designated by RISWMC. Rhode Island Department of Environmental Management, Rhode Island Solid Waste Management Corporation, Emergency Flow Control Regulations (June 3, 1991). Since DEM has no authority to license out-of-state facilities, the effect of that requirement is to totally prevent solid waste from being transported out of Rhode Island for disposal.

PRELIMINARY INJUNCTION STANDARD
One of the principal purposes of a preliminary injunction is to preserve the status quo pending ultimate resolution of the case. Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir.1986). However, a preliminary injunction is a drastic form of relief because it affects the rights of a party before that party has had an adequate opportunity to develop and present the merits of its case. Consequently, courts have devised a rather rigorous standard that must be satisfied before such relief is granted. That standard is well established. It requires the party seeking the injunction to demonstrate:
(1) That it does not have an adequate remedy at law and will suffer irreparable harm before the case can be litigated on the merits if the injunction is not granted;
(2) That such harm outweighs any harm that the adverse party will suffer if the injunction is granted;
(3) That it is likely to ultimately succeed on the merits of its claim; and
(4) That the requested injunction will not adversely affect the public interest.
Collazo Rivera v. Torres Gaztambide, 812 F.2d 258, 259 (1st Cir.1987); Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir.1981).

DISCUSSION

I. Irreparable Harm to Plaintiff

Based on the evidence currently before it, the Court finds that RISWMC's export ban will likely cause DeVito's business to fail before a trial is held. Approximately 50% of DeVito's gross annual revenue is derived from hauling Rhode Island waste to out-of-state facilities for disposal. Since waste disposal is a particularly profitable part of DeVito's business and DeVito's ability to attract it is based largely on the favorable "tipping" fees obtained at out-of-state facilities, the ban undoubtedly will result in the loss of that business. Without that business, it is unlikely that DeVito will be able to meet the overhead costs associated with the fleet of equipment it purchased to transport the Rhode Island waste.
Those conclusions are confirmed by the fact that during the short time the ban has been effect, DeVito has experienced significant declines in gross income which have necessitated laying off of some of its employees. DeVito estimates that its business cannot continue to operate at current levels for more than six months.
That prospect is sufficient to establish irreparable harm. Because the failure of a business constitutes a loss that is difficult to measure, money damages generally cannot provide an adequate remedy. Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174, 1179 (5th Cir. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 588 F.2d 24 (2d 1978), cert. denied, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). Thus, the First Circuit has stated "[t]he threat of substantial damage to [plaintiff's] hard-won business and reputation ma[k]e out a sufficient showing of irreparable harm to warrant immediate redress." Hypotherm Inc. v. Precision Prods., Inc., 832 F.2d 697, 700 (1st Cir. 1987). Even when the monetary loss can be measured, courts have held that the threatened failure of a business warrants injunctive relief. See, e.g., Art-Metal U.S.A. v. Solomon, 473 F.Supp. 1, 4 (D.D.C.1978).

II. Irreparable Harm to Defendants

The relative harm to RISWMC if an injunction is granted is far less than that *779 facing DeVito. The 400 tons of waste per day that DeVito was hauling to out-of-state facilities represents slightly more than 10% of the daily volume at the CLF and approximately 20% of the commercial waste volume. While the impact of losing the fees generated by that volume is more than minimal, it is far less than the catastrophic impact the export ban is having on DeVito. In short, the "balancing of the harms" component of the preliminary injunction test favors granting an injunction.

III. Public Interest

The public interest component of the preliminary injunction test also weighs slightly in favor of granting an injunction. Those Rhode Islanders who generate noncommercial waste may have an understandable desire to ensure that fees charged for commercial waste continue to subsidize the activities of RISWMC to the maximum extent possible. However, that desire is not necessarily synonymous with the public interest.
In any event, it is outweighed by the public interest in ensuring that the Constitution is upheld and that unjustifiable restrictions are not placed on the free flow of interstate commerce. Businesses, in particular, have a strong interest in having the freedom to dispose of waste at rates set by an unfettered interstate market rather than an artificially created monopoly.

IV. Likelihood of Success

A. The Commerce Clause
The Commerce Clause of the United States Constitution provides that "Congress shall have the power ... to regulate Commerce ... among the several states." U.S. Const. art. I, § 8. That provision reflects the concern of the Framers that
[I]n order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.
Hughes v. Oklahoma, 441 U.S. 322, 325-26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). Accordingly, the Commerce Clause has been interpreted
[N]ot only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation.
Id. at 326, 99 S.Ct. at 1731.
That limitation on state action is sometimes referred to as the "dormant" commerce clause. It rests on the principle that the nation is a single economic unit and individual states may not inhibit commerce by economically isolating themselves from each other. As the Supreme Court has stated:
Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.
H.P. Hood & Sons v. Du Mond, 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949).
On the other hand, the Supreme Court has recognized the right of states to adopt regulations designed to safeguard the health and safety of its people even though such regulation may incidentally burden interstate commerce. See City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). Thus, it has been stated that
[t]he Commerce Clause does not ... invalidate all state restrictions on commerce. It has long been recognized that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the states to make laws governing matters of local concern which nevertheless in some measure affect interstate *780 commerce or even, to some extent, regulate it."
Kassel v. Consolidated Freightways Corp. of Del., 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981) (quoting Southern Pac. Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945)).
In an effort to reconcile these sometimes conflicting principles, the Supreme Court has identified three inquiries that are relevant to determining whether state regulation imposes an impermissible burden on interstate commerce. They are:
(1) whether [it] regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect;
(2) whether the [regulation] serves a legitimate local purpose; and, if so,
(3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.
Hughes, 441 U.S. at 336, 99 S.Ct. at 1736.
A neutral regulation, which imposes only an incidental burden on interstate commerce is valid as long as that burden is not "clearly excessive in relation to the putative local benefits" the regulation is designed to serve. Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). On the other hand, a regulation that discriminates against interstate commerce by treating it less favorably than intrastate commerce violates the Commerce Clause unless it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988). When the discrimination amounts to nothing more than "economic protectionism" by benefiting in-state economic interests at the expense of out-of-state competitors, the regulation is deemed unconstitutional per se. Philadelphia v. New Jersey, 437 U.S. at 624, 98 S.Ct. at 2535.
The burden of establishing that a regulation is discriminatory rests on the party challenging it. However, once it is shown that the regulation discriminates against interstate commerce, it must be subjected to the "strictest scrutiny" and "the burden falls on the State to demonstrate both that the statute `serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." Taylor, 477 U.S. at 138, 106 S.Ct. at 2447 (quoting Hughes, 441 U.S. at 336, 99 S.Ct. at 1736); see also Sporhase v. Nebraska ex rel. Douglas, 458 U.S. 941, 957, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982).

B. Discrimination

It is clear that the interstate movement of solid waste is "commerce" within the meaning of the Commerce Clause. Philadelphia v. New Jersey, 437 U.S. at 622, 98 S.Ct. at 2534. Despite RISWMC's suggestion to the contrary, it is equally clear that the proscriptions of the Commerce Clause apply to restrictions on transporting items out of a state as well as into a state. Hughes, 441 U.S. at 336-37, 99 S.Ct. at 1736-37 (statute forbidding transportation of minnows out of state discriminates against interstate commerce). Thus, the Supreme Court has said:
In both instances, the State has overtly moved to slow or freeze the flow of commerce.... It does not matter that the State has shut the article of commerce inside the State in one case and outside the State in the other. What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade.
Philadelphia v. New Jersey, 437 U.S. at 628, 98 S.Ct. at 2537-38.
In determining whether a regulation incidentally burdens interstate commerce or impermissibly discriminates against it, the purpose of the regulation is not necessarily dispositive. A regulation serving a "protectionist" purpose is clearly invalid. Philadelphia v. New Jersey, 437 U.S. at 624, 98 S.Ct. at 2535; cf. H.P. Hood & *781 Sons, 336 U.S. at 537-38, 69 S.Ct. at 664-65. However, the absence of such a purpose does not establish the regulation's validity because "the evil of protectionism can reside in legislative means as well as legislative ends." Philadelphia v. New Jersey, 437 U.S. at 626, 98 S.Ct. at 2536 (emphasis added). Thus, in Philadelphia v. New Jersey the Court held unconstitutional a New Jersey statute prohibiting the importation of solid waste originating outside the state saying:
[The] dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case.... Thus, it does not matter whether the ultimate aim of [the statute] is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment.... But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently.
Id. at 626-27, 98 S.Ct. at 2536-37.
In the absence of a manifestly protectionist purpose, the determination as to whether a regulation is discriminatory hinges on how directly it burdens interstate commerce and how evenhandedly it impacts interstate and intrastate commerce. Thus, a regulation that "on its face or in practical effect" restricts the interstate but not the intrastate movement of goods or imposes heavier burdens on interstate commerce than those imposed on intrastate commerce is more likely to be held discriminatory than a regulation that affects interstate commerce only indirectly and in a manner and to a degree that is not appreciably different from the way it affects intrastate commerce. Hughes, 441 U.S. at 336, 99 S.Ct. at 1736; Taylor, 477 U.S. at 138, 106 S.Ct. at 2447; Norfolk S. Corp. v. Oberly, 822 F.2d 388, 406 (3rd Cir.1987).
In this case, the evidence presently before the Court indicates that the regulation is an essentially protectionist measure. Its immediate purpose and effect are to increase RISWMC's revenues by preventing commercially generated waste from being transported out of Rhode Island for disposal and requiring instead that it be deposited at the CLF. The regulation obviously was enacted in response to statistics revealing a steady decline in the quantity of commercial waste deposited at CLF since 1987. That decline is significant because RISWMC makes a profit from the "tipping" fees it receives for commercial waste. The profit subsidizes the cost of operating the CLF and helps defray the expenses RISWMC incurs in carrying out some of its other statutorily imposed mandates. Without commercial waste revenues, the CLF would incur a deficit because, by law, RISWMC is prohibited from charging municipalities a "tipping" fee of more than $14 per ton which is considerably less than the per ton cost associated with operating the CLF. In addition, "tipping" fees are RISWMC's only source of revenue and, therefore, are used to finance such other programs as hazardous waste disposal, recycling, and construction of a waste-to-energy facility that RISWMC is charged with the responsibility of implementing. Consequently, RISWMC customarily fixes the charge for commercial waste at whatever level is necessary to support those activities.
Further evidence that the regulation is designed to serve RISWMC's financial interests is that one year ago it lowered its commercial "tipping" fee from $59 per ton to $49 per ton in an effort to combat what it terms the increased "migration" of commercial waste to other states. Although that measure temporarily reversed the decline in commercial waste volume, the decline resumed in the fall of 1990. At that time, RISWMC began considering the regulation in question for what its then chairman characterized as primarily economic reasons. RISWMC candidly acknowledges that the regulation provides the money necessary to carry out its statutorily mandated responsibilities.
*782 Finally, like the New Jersey statute at issue in Philadelphia v. New Jersey, RISWMC's regulation "overtly blocks the flow of interstate commerce at a State's borders" which is the type of restriction that the Supreme Court has characterized as the "clearest example" of economic protectionism. Philadelphia v. New Jersey, 437 U.S. at 624, 98 S.Ct. at 2535. Imposition of an absolute ban on the interstate movement of an item is one of the principal indicia of regulations that have been held invalid per se. Id. at 628, 98 S.Ct. at 2537; Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928); Pennsylvania v. West Va., 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); West v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911).
RISWMC contends that its regulation is not discriminatory for two reasons. First, it points out that the regulation applies equally to both Rhode Island haulers and out-of-state haulers. Furthermore, it asserts that the principal burden of the export ban falls primarily on local interests, namely, local commercial and industrial waste generators who must pay more to have their waste disposed of in Rhode Island. This Court does not find either of those reasons persuasive.
It is true that a regulation's adverse impact on local interests has been recognized as an important factor in Commerce Clause analysis because "the existence of substantial in-state interests harmed by a regulation is `a powerful safeguard' against legislative discrimination." J. Filiberto Sanitation Inc. v. State of New Jersey Dept. of Envtl. Protection, 857 F.2d 913, 921 (3rd Cir.1988) (quoting Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 473 n. 17, 101 S.Ct. 715, 728 n. 17, 66 L.Ed.2d 659 (1981)). However, the mere fact that a regulation applies to instate as well as out-of-state interests does not prevent it from being denominated discriminatory. Filiberto, 857 F.2d at 919 (citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 350-52, 97 S.Ct. 2434, 2445-46, 53 L.Ed.2d 383 (1977)). As the Third Circuit has said:
The essential question [in this regard] is whether the challenged regulation confers an advantage upon in-state economic interests  either directly or through imposition of a burden upon out-of-state interests  vis-a-vis out-of-state competitors.
Filiberto, 857 F.2d at 919. Moreover, as previously noted, the type of discrimination prohibited by the Commerce Clause may occur when interstate commerce itself is treated less favorably than intrastate commerce. See Philadelphia v. New Jersey, 437 U.S. at 626, 98 S.Ct. at 2536; Norfolk S., 822 F.2d at 401.
In this case, both forms of discrimination are present. The regulation at issue confers a direct advantage upon RISWMC in its capacity as proprietor of the CLF by, in effect, requiring commercial waste to be disposed of at that site. Furthermore, that benefit is gained at the expense of both out-of-state interests (i.e. out-of-state facilities and haulers like DeVito who transport commercial waste to them) and interstate commerce itself which is totally eliminated.
RISWMC's reliance on Filiberto is misplaced. In that case, a hauler desiring to transport New Jersey waste directly to out-of-state landfills challenged a New Jersey regulation requiring that the waste first be taken to state operated transfer stations for processing. The Court held that the regulation did not violate the Commerce Clause because it did not advantage instate business in relation to out-of-state business in the same market. Filiberto, 857 F.2d at 921. That conclusion was based on the fact that:
One of the principal functions of the transfer station is the compacting of trash to allow its efficient long-distance transport to landfills. In performing this function, the station is not in competition with out-of-state landfills. On the contrary, the station is their customer.

Filiberto, 857 F.2d at 921 (emphasis in original).
This case is readily distinguishable because RISWMC is in competition with DeVito and/or the out-of-state facilities to which Rhode Island solid waste is transported. *783 Furthermore, the regulations establish an absolute ban on exporting solid waste rather than a mere requirement that it first be processed locally. Finally, the ban confers a direct economic advantage on RISWMC in its capacity as a participant in the market (i.e. as the operator of CLF) by giving it the exclusive right to receive waste generated within the state and the associated profits.
In short, the Court finds that RISWMC's regulation does not apply evenhandedly and imposes far more than an incidental burden on interstate commerce. It directly and completely eliminates interstate commerce and has both the purpose and effect of conferring an economic benefit on RISWMC at the expense of those engaged in interstate commerce.
It is difficult to say whether the regulation is invalid per se because there is no "bright line" separating regulations that are merely suspect from those that are unlawful on their face. A regulation that, on its face, appears to be protectionist may, on closer analysis, be validated "by showing that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." New Energy, 486 U.S. at 278, 108 S.Ct. at 1810. However, at the very least, the appearance of facial discrimination requires that the regulation be strictly scrutinized and that RISWMC carry the burden of making that showing. Id.; Hughes, 441 U.S. at 337, 99 S.Ct. at 1737.

C. Local Purpose and Alternative Means
RISWMC points to the purposes enumerated in the preamble to the regulation as justification for any impact the regulation may have on interstate commerce. However, the mere recitation of a legitimate purpose is not conclusive and, by itself, is insufficient to discharge RISWMC's burden. See Hughes, 441 U.S. at 336, 99 S.Ct. at 1736. Therefore, the Court must look to the evidence presented to determine whether the regulation does, in fact, serve those purposes. In so doing, it is mindful of the fact that considerable deference should be given to RISWMC's judgments with respect to matters that are fairly debatable. However, the Court need not accept RISWMC's assertions to the extent they are clearly unsupported or contradicted by the evidence.
The recited purposes are as follows:
(a) maximize resource recovery from solid waste and maximize recycling and reuse of such resources,
(b) protect and conserve public resources and the public health,
(c) ensure that illegal disposal of solid waste, whether in Rhode Island or elsewhere, does not occur,
(d) reduce or eliminate liability of the agencies and municipalities of the State for the illegal disposal of solid and hazardous waste that may be commingled with solid waste,
(e) plan for and regulate the amount and character of vehicle traffic which transports solid waste, and
(f) to plan for the establishment of systems and facilities to accomodate [sic] solid waste disposal and processing needs on a long term basis.
Rhode Island Solid Waste Management Corporation Flow Control Regulations at 1, para. 1. Those purposes will be considered in turn.

1. Maximize Resource Recovery and Recycling

RISWMC does not explain how diverting solid waste from out-of-state facilities where it is burned to generate electricity to the CLF where it is buried promotes resource recovery. As to materials that are not recyclable, the regulation appears to have the reverse effect in that nothing of value is recovered. With respect to materials that are recyclable, it is impossible to determine from the record presently before the Court, whether and to what extent recycling takes place at either CLF or the out-of-state facilities. Therefore, there is no basis for concluding whether taking them to one place or the other serves or disserves the stated purpose.
Furthermore, while Rhode Island clearly has a strong local interest in recycling waste that would otherwise be disposed of *784 within its borders, its interest in recycling waste earmarked for disposal elsewhere is far less compelling. One of the principal benefits of recycling is to conserve the state's landfill sites by reducing the quantity of trash that would otherwise be disposed of there. That purpose is not served by requiring recycling of waste destined for disposal elsewhere.
A less parochial purpose of recycling is to conserve the resources from which materials in the waste stream are made. However, to the extent that purpose may be characterized as a "local" interest, it could easily be served by requiring recycling of all waste collected in Rhode Island irrespective of its ultimate place of disposition.

2. Public Resources and Health

The solid waste itself clearly is not a resource as evidenced by the fact that fees are charged to dispose of it. The principal resources implicated in burying solid waste are the land that must be used to accommodate it and the ground water supplies into which its effluent might leach. By preventing waste from being transported out of Rhode Island, the regulation has the effect of depleting the former resource and increasing the likelihood of polluting the latter.
Moreover, no evidence has been presented of any connection between RISWMC's export ban and the protection of public health. RISWMC did cite one instance in which a truck owned by DeVito apparently transported a small quantity of radioactive material to one of the out-of-state facilities. However, the material was detected by sophisticated equipment at that facility and returned to Rhode Island for proper disposal as hazardous waste. No showing was made that such materials could be more readily detected if initially taken to the CLF or that any Rhode Island local health purpose is served by disposing of them in Rhode Island rather than at a licensed facility elsewhere. Nor has any reason been presented as to why preventing the transportation of such materials outside of Rhode Island could not be accomplished by local inspections rather than an absolute export ban.
The clearest evidence that the regulation serves no local conservation or health purpose is the fact that several years ago RISWMC banned the importation of solid waste in an effort to prolong the life of the CLF and reduce pollution risks.

3. Prevention of Illegal Disposal in Rhode Island or Elsewhere

Certainly Rhode Island has a compelling interest in preventing the illegal disposal of waste within its borders. However, the regulation in question does not serve this purpose. If anything, it increases the risk that waste will be disposed of improperly within the state by preventing any waste from being exported.
Rhode Island has a far less compelling interest in regulating the disposal of waste in other states. That is a matter of primary interest in those states.
In any event, the facilities utilized by DeVito appear to be licensed by the states in which they are located, and there is no evidence that Rhode Island wastes are being illegally disposed of there or elsewhere. Any legitimate concern that RISWMC does have about such a possibility could easily be addressed by requiring haulers to disclose the locations to which they are transporting Rhode Island waste.

4. Elimination of Liability

RISWMC offers little to support its assertion that the regulation at issue will reduce or eliminate liability of the state and its municipalities for illegal disposal of waste at out-of-state facilities. As previously noted, the facilities being utilized all appear to be licensed by the states in which they are located, and there is nothing to suggest that those wastes are being disposed of in an illegal fashion.
Moreover, it appears that all state and municipal waste is disposed of at the CLF rather that at out-of-state locations because of the favorable "tipping" fees charged at that facility. Accordingly, the only waste transported out of state is that generated by private businesses and transported by *785 private haulers. Therefore, it is difficult to see what liability could be incurred by the state or its subdivisions if that waste is disposed of improperly. The export ban does not even protect the private businesses themselves from liability. They are potentially responsible for the consequences of illegal disposal of certain kinds of waste whether such disposal occurs in Rhode Island or elsewhere.

5. Regulation of Traffic

Even if regulation of traffic is assumed to be within the purview of RISWMC, no explanation is offered as to how the regulation at issue will reduce traffic. On the contrary, it would seem that traffic on Rhode Island highways, particularly in the vicinity of the CLF, will be increased by preventing solid waste from being transported outside the state.

6. Establishment of Long-Term Facilities

There does appear to be some merit in RISWMC's contention that the export ban will facilitate construction of publicly owned waste-to-energy facilities in Rhode Island. Plans for one such facility have already been formulated, and a request for final regulatory approval is pending, but by no means certain. That project will be financed by the sale of bonds issued by RISWMC. In order to make those bonds marketable, potential investors must be convinced that they will be repaid. As the financing arrangements are presently structured, assurances of payment are provided by RISWMC's general revenues. Therefore, diminution of the stream of commercial waste brought to the CLF will reduce both RISWMC's revenues and the level of assurance provided to prospective bondholders.
DeVito rather blithely dismisses that justification for the export ban by pointing out that the bonds could be made even more saleable without such a ban if they were issued or guaranteed by the State of Rhode Island. However, it offers no reason why the State cannot choose to place that burden on those who generate the solid waste rather than on the general public.
Nevertheless, an otherwise legitimate purpose may not be achieved by improper means. RISWMC has failed to establish that a total ban on interstate commerce is necessary to achieve this long term goal and that it cannot be accomplished by some less intrusive alternative. The circumstances requiring an export ban to prevent the "migration" of Rhode Island solid waste were created by RISWMC itself by setting commercial "tipping" fees at an artificially high rate in order to subsidize its other activities. RISWMC is entitled to make that choice but not to make interstate commerce bear the consequences.
Moreover, RISWMC has failed to satisfactorily explain why other methods of financing the proposed waste-to-energy facility could not be utilized. One such possibility is the issuance of revenue bonds that would be repaid from the fees earned by that facility. Although the evidence indicates that such a method would not be as favorable as the one proposed, it is at least a possible alternative. The feasibility of alternative approaches is evidenced by the fact that revenue bonds were previously sold to finance such a facility long before any flow control regulations were adopted.
In short, the mere fact that construction of a waste-to-energy facility may be a legitimate local purpose does not mean that any method of achieving that purpose is therefore legitimate. The method selected must be evaluated in light of the burden it places on interstate commerce and the availability of less burdensome alternatives. When, as in this case, the burden takes the form of an absolute ban on interstate commerce, there must be a strong showing that the interest at stake is a particularly compelling one and that reasonable, less burdensome alternatives do not exist. In this case, no such showing has yet been made.

CONCLUSION
For all of the foregoing reasons, the plaintiff's request for a preliminary injunction is granted, and the Rhode Island Solid Waste Management Corporation is *786 preliminarily enjoined from enforcing those portions of its emergency flow control regulations that prohibit the transportation of solid waste to facilities licensed outside the State of Rhode Island for disposal.
IT IS SO ORDERED.
NOTES
[1] There are several small, privately operated landfills in Rhode Island that by reason of their size and/or restrictions on the types of waste they are licensed to accept cannot accommodate most commercial waste.
[2] The rate RISWMC charges to municipalities is fixed by law at approximately $14 per ton.