WASTE RECYCLING, INC.,
et al., Plaintiffs,

v.

SOUTHEAST ALABAMA SOLID WASTE
DISPOSAL AUTHORITY, et al.,
Defendants.

Civ. A. No. 92–T–642–S.

United States District Court,
M.D. Alabama, S.D.

March 8, 1993.

Robert F. Northcutt, Charles B. Paterson, Montgomery, AL, for plaintiffs.

Woodham Wendell Cauley, Jr., Robert Dinning Thorington, Montgomery, AL, for defendants.

Ronald W. Farley, Alabama Dept. of Environmental Management, R. Craig Kneisel, William Duncan Little, Asst. Attys. Gen., Montgomery, AL, for amicus James H. Evans.

Bart Gregory Harmon, James W. Webb, Montgomery, AL, for amicus The Ass'n of Commissions of Alabama.

Charles H. Younger, Huntsville, AL, John Kenneth Smith, Alabama League of Municipalities, Legal Counsel, Montgomery, AL, for amicus Solid Waste Disposal Authority of the City of Huntsville, Alabama (Huntsville Authority), Alabama League of Municipalities.

H. Dean Mooty, Jr., Montgomery, AL.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

The question presented in this lawsuit is whether three representative versions of municipal ordinances governing the collection and disposal of solid waste in a four-county region in southeastern Alabama impermissibly restrict the disposal of such waste to that area, in violation of the commerce clause of the United States Constitution, art. I, § 8, cl. 3. The plaintiffs are private businesses engaged in the collection and disposal of solid waste: Waste Recycling, Inc., Waste Away Group, Inc., Waste Away, Inc., Brundidge Waste Disposal Center, Inc., and Durjac Twelve, Inc. The defendants are Southeast Alabama Solid Waste Disposal Authority, which seeks to build a facility in the region, and the cities of Headland, Geneva, and Ozark, which have been named as representatives of 36 local governments—32 cities and towns and four counties—in the area.[1] Some of the 36 local governments have signed, and the others intend to sign, contracts with the Authority obligating them to adopt laws regulating the disposal of all solid waste generated and collected within their borders.

Based on the submitted evidence and briefs, the court concludes that the three representative ordinances adopted by the cities of Headland, Geneva, and Ozark pursuant to these contracts discriminate against interstate commerce in violation of the commerce clause.[2]

### I.

Waste Away Group and Waste Away collect and dispose of a significant portion of the solid waste in the southeastern Alabama region covered by the Authority. Their customers are residential, commercial, industrial, and governmental. The two companies dispose of most of their collected waste at the Spring Hill Landfill, in Jackson County, Florida, just south of the Alabama state line.

Waste Recycling recycles solid waste, as well as collects and disposes of it. It does business both within and outside Alabama. Solid waste brought to its facility in southeast Alabama is mined for recyclables, and the remaining waste then hauled to the Spring Hill Landfill in Florida. Since its facility first opened in 1992, the company has transported several thousand tons of solid waste to the Spring Hill Landfill, the majority of which was collected in the area covered by the Authority.

Brundidge Waste Disposal Center and Durjac Twelve are in the process of developing a solid waste disposal facility in southeast Alabama. Waste Away Group and Waste Recycling intend to dispose of some of the waste currently being taken to Florida at this facility once it is completed.

The Southeast Alabama Solid Waste Authority is a public non-profit corporation organized under state law.[3] The Authority was organized by four counties, along with over 30 cities and towns located within these counties, to address their solid waste management needs. The Authority was created in response to legislation requiring every county and city in Alabama to develop and adopt a comprehensive solid waste management

---

1. The four counties are Dale, Geneva, Henry, and Houston. The 32 cities and towns are Abbeville, Ariton, Ashford, Avon, Black, Clayhatchee, Coffee Springs, Columbia, Cottonwood, Cowarts, Daleville, Eunola, Geneva, Gordon, Grimes, Haleburg, Hartford, Headland, Kinsey, Level Plains, Madrid, Malvern, Midland City, Napier Field, Newton, Newville, Ozark, Pinckard, Samson, Slocomb, Taylor, and Webb.

2. The plaintiffs charge that the contracts, as well as the representative ordinances, violate the commerce clause. The court does not reach the question of the constitutionality of the contracts. Because the court's ruling on the representative ordinances will probably result in a substantial

change in the contracts, it would be premature for the court to rule on the contracts at this time.

In addition, the plaintiffs have raised several additional challenges to the contracts and ordinances. By agreement of the parties, these other challenges have been stayed pending resolution of the plaintiffs' commerce clause challenge, which was set for expedited hearing.

3. Sections 11–89A–1 to –21 of the 1975 Ala.Code (1985 & Supp.1992) authorize counties and municipalities to participate jointly in the creation of solid waste disposal authorities and in the construction of facilities for solid waste management.

plan.[4] The Authority plans to build a regional solid waste disposal facility and three waste disposal transfer stations. The project will be financed by revenue bonds. The bonds will be secured by the pledge of all money received by the Authority as fees and charges for the disposal of solid waste at the Authority's facility.[5]

The cities of Headland, Geneva, and Ozark are three participating members of the Authority. Each has signed a "user contract" with the Authority to use its solid waste disposal services. The contracts require that each city adopt a "flow control"[6] ordinance mandating that all solid waste collected within its boundaries by public or private collectors be delivered only to the Authority's facility. The user contracts also require that each city not authorize or approve any competing disposal sites within its borders. Headland, Geneva, and Ozark have adopted ordinances typical of the ordinances and laws that the other local governments have adopted or intend to adopt pursuant to the user contracts.

The Headland ordinance provides that the city may either itself continue to collect solid waste or allow private collectors and haulers to contract directly with generators of solid waste, but that in either case all solid waste generated in the city must be carried to and disposed of at the Authority's facility. The ordinance requires public participation and prohibits any business from using the streets and public places of the city to collect and haul solid waste unless the business agrees to transport the waste to the Authority's facility. The Headland ordinance provides for civil enforcement procedures and misdemeanor penalties.

Geneva's flow control ordinance differs from the Headland ordinance in only one significant way. With two exceptions, the ordinance vests in the city title to all waste generated within its boundaries and prohibits

private collectors from contracting directly with generators of solid waste. The city retains the exclusive right to collect all solid waste generated within its borders unless it chooses to contract with private haulers and collectors.

The Ozark flow control ordinance also differs from the Headland ordinance in only one significant way. It permits collectors and haulers to take waste either to the Authority's facility or out-of-state. However, a hauler must satisfy certain reporting requirements before it is allowed to transport waste out-of-state. The hauler must report each month in a sworn statement the daily total amount of solid waste collected, the location and daily amount collected from each customer, the location outside the state to which the solid waste was transported for disposal or transshipment, and the routes by which the solid waste was transported to those locations. Waste hauled in-state to the Authority's facility is not subject to these reporting requirements. Ozark was allowed to adopt this ordinance even though the user contract it signed with the Authority required that all waste collected within its boundaries be delivered to only the Authority's facility.

## II.

The plaintiffs claim that the three representative flow control ordinances passed by the cities of Headland, Geneva, and Ozark discriminate against interstate commerce in favor of in-state commerce in violation of the commerce clause; because the ordinances require either on their face or in effect that all solid waste collected within the three cities' boundaries be delivered to the Authority's facility, the plaintiffs contend, the ordinances prevent solid waste from being disposed of out-of-state and in interstate commerce. The commerce clause gives to the United States Congress the authority "To regulate Commerce ... among the several States

4. On May 16, 1989, the Alabama Legislature enacted Act No. 89–824, mandating that every county and municipality in the state develop and adopt a solid waste management plan by the end of 1991. This act is codified at 1975 Ala.Code §§ 22–27–40 to –49 (1990 & Supp.1992).

5. All users of the regional facility will pay a uniform cost, or "tipping fee," a per ton charge for solid waste delivered to the Authority's facility.

6. The term "flow control" refers to the ability of the locality to designate the disposal site of materials in the waste stream.

..." U.S. Const. art. I, § 8, cl. 3. Although the clause on its face does not speak of restricting the power of the states, the Supreme Court has held that the clause has such a negative aspect as well: it "prohibits States from 'advanc[ing] their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state,'" even in the absence of affirmative congressional action. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, ⸺ U.S. ⸺, ⸺, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992), quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949). States are generally prohibited from taking actions that interfere with the free flow of trade among the states unless the interference is demonstrably justified by a valid factor unrelated to economic protectionism. *Fort Gratiot*, ⸺ U.S. at ⸺, 112 S.Ct. at 2023–24. This limitation rests on the principle that the nation is a single economic unit and individual states may not inhibit commerce by isolating themselves economically from each other. *H.P. Hood*, 336 U.S. at 537–39, 69 S.Ct. at 664–65. The burden to show interference rests on the party challenging the validity of the state action. *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

### A.

■ Municipal ordinances are undoubtedly subject to the same scrutiny under the commerce clause as are state laws. *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 353, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951); *Wood Marine Service, Inc. v. City of Harahan*, 858 F.2d 1061, 1064 (5th Cir.1988). The defendants argue that the Headland, Geneva, and Ozark flow control ordinances are nevertheless not subject to the commerce clause under the "market-participant doctrine."

■ The market-participant doctrine provides that, if a state or local government acts as a market participant rather than as a market regulator, its conduct is not subject to commerce clause scrutiny. *White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 207, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983). Admittedly, attempts to apply the critical distinction between market regulator and market participant have given rise to considerable disagreement in the Supreme Court's jurisprudence about the reach of the doctrine. As the Third Circuit Court of Appeals has noted, the author of each of the three Supreme Court opinions upholding the application of the market-participant doctrine issued a dissent in the next. *Swin Resource Systems, Inc. v. Lycoming County*, 883 F.2d 245, 249 (3rd Cir.1989), *cert. denied*, 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (6–3 decision, Powell, J.) (upholding application of doctrine); *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (5–4 decision, Blackmun, J.) (same); *id.* at 447, 100 S.Ct. at 2282 (Powell, J., dissenting); *White v. Massachusetts Council*, 460 U.S. at 205, 103 S.Ct. at 1043 (7–2 decision, Rehnquist, J.) (same); *id.* at 215, 103 S.Ct. at 1048 (Blackmun, J., dissenting); *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (4–4 plurality decision, White, J.) (rejecting application of doctrine); *id.* at 101, 104 S.Ct. at 2248 (Rehnquist, J., dissenting); *see also* Dan T. Coenen, *Untangling the Market–Participant Exemption to the Dormant Commerce Clause*, 88 Mich.L.Rev. 395, 404–405 (1989) (discussing judicial voting patterns in market-participant cases). Nevertheless, although "[t]he precise contours of the market-participant doctrine have yet to be established," *South–Central Timber*, 467 U.S. at 93, 104 S.Ct. at 2243, the three ordinances challenged here do not present a close case: they clearly constitute market regulation.

At least two reasons underlie the market-participant doctrine. First, there is "'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *White v. Massachusetts Council*, 460 U.S. at 207 n. 3, 103 S.Ct. at 1044 n. 3, quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). "Evenhandedness suggests that, when acting as proprietors, States should ...

share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." *Reeves, Inc. v. Stake,* 447 U.S. at 439, 100 S.Ct. at 2278–79 (citations omitted). Second, "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace." *Id.* at 436–37, 100 S.Ct. at 2277 (citation omitted). "There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." *Id.*

■ The critical question for the court therefore is whether the challenged governmental conduct is more analogous to business activities of traders and manufacturers—in which case the state should be allowed to pursue its own economic interest and determine those with whom it will deal in the private market—or is more analogous to an effort to regulate activities among such parties in the private market—in which case the state's conduct must be subject to commerce clause scrutiny. The Supreme Court has so far addressed application of the market-participant doctrine only four times—three times finding the doctrine applied to and immunized state conduct from commerce clause scrutiny, and one time finding the doctrine did not apply. In *Alexandria Scrap,* the Court upheld application of the doctrine to a Maryland program designed to encourage the recycling of abandoned automobiles. The program offered a bounty for every Maryland-titled automobile converted into scrap if the scrap processor supplied documentation of ownership; the program, however, imposed more exacting documentation requirements on out-of-state than in-state processors. The Court held that the state may enter "the market as a purchaser, in effect, of a potential article of interstate commerce" and "restric[t] its trade to its own citizens or businesses within the State." 426 U.S. at 808, 96 S.Ct. at 2497.

In *Reeves, Inc. v. Stake,* the Court confronted a South Dakota policy that confined the sale of cement by a state-operated cement plant to residents of the state. In upholding application of the doctrine, the Court concluded that South Dakota, "as a seller of cement, unquestionably fits the 'market participant' label." 447 U.S. at 440, 100 S.Ct. at 2279. In *White v. Massachusetts Council,* the Court applied the doctrine to an executive order of the Mayor of Boston that required all construction projects funded in whole or in part by city funds or city-administered funds to be performed by a work force of at least 50% city residents. Crucial to the Court's analysis was the fact that the employees were working for the city. 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7. *See also United Bldg. & Constr. Trades Council v. Mayor of Camden,* 465 U.S. 208, 219, 104 S.Ct. 1020, 1028, 79 L.Ed.2d 249 (1984) (explaining limitation of holding in *White v. Massachusetts Council* ).

Finally, in *South–Central Timber,* the Court confronted an Alaskan requirement that timber taken from state lands be processed within the state prior to export and for the first time rejected application of the doctrine. While "Alaska . . . participates in the timber market," the Court plurality wrote, it also "imposes conditions downstream in the timber-processing market" in that the timber buyer "is not free to take the timber out of state prior to processing." 467 U.S. at 95, 104 S.Ct. at 2244. The plurality explained that "The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further." *Id.* at 97, 104 S.Ct. at 2245. "The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market." *Id.*

■ Applying the above principles and holdings, this court easily concludes that the market-participant doctrine does not apply to the Headline, Geneva, and Ozark flow control ordinances. The court need not search deeply to find compelling evidence that the three cities' claim to the doctrine is meritless—that is, that the cities are not purchasers as was Maryland in *Alexandria Scrap,* or sellers as was South Dakota in *Reeves, Inc. v. Stake,* or bona fide interest holders in construction projects as was Boston in *White v. Massachusetts Council.* The user contracts—which were drawn up by the Authority and

signed by the three cities and upon which the ordinances are based—expressly reflect that the intended effect of the ordinances is to assure the Authority's economic success by keeping locally generated solid waste out of interstate commerce and within the local area, and thus provide a steady and adequate supply for the Authority. The contracts state:

> "In order to assure and enhance the marketability of the Authority's Bonds, it is necessary that the Authority have available at all times an adequate supply of Acceptable Waste from which it will derive Tipping Fees, inspection surcharge fees and other user charges ... Accordingly, the governing body of the Participating Subdivision shall ... adopt a Flow Control Ordinance...."

Headland, Geneva, and Ozark then reaffirmed their commitment to this directive in the preambles to their ordinances, each of which provides that:

> "to assure the viability of the Authority and to assure and enhance the marketability of any Bonds that the Authority may issue, it is necessary that the Authority have available at all times an adequate supply of the Acceptable Waste from which it will derive tipping fees, inspection surcharge fees and other user charges."

In addition, to reinforce the restrictions in the ordinances, the user contracts prohibit the local governments from authorizing or approving any competing disposal sites within their borders. In signing the user contracts, therefore, the three cities entered the solid waste markets not to compete for their own individual profit, as would private businesses, but rather they did so to assure the economic success of the Authority. The expressed intent behind these contracts and the three representative ordinances based on them is not individual market participation but broad market regulation.

But even more telling are the language the three ordinances use and the measures the ordinances and the underlying user contracts adopt. The ordinances expressly indicate that they are regulations. They are entitled "flow control" ordinances, implying that their primary purpose is to "control," not partici-

pate in, the "flow" of solid waste in the stream of commerce. In addition, they state that they provide a "system of service" for "the storage, collection, transportation, and disposal and *regulation* of Solid Waste." (Emphasis added). The ordinances and the user contracts also contain measures that are clearly and uniquely regulatory and governmental in nature. The ordinances require public participation; prohibit private businesses from collecting and disposing of solid waste unless the businesses comply with the ordinances; prohibit businesses who fail to comply with the ordinances from using public streets to collect and haul solid waste; and threaten civil enforcement and misdemeanor penalties against violators. In addition, as previously indicated, the user contracts prohibit the local governments from authorizing or approving within their borders any disposal sites which would compete with the Authority. The cities would be able to implement such provisions only because of the regulatory powers they possess as sovereigns. These are not the types of measures which private participants in the marketplace could implement. *See Alexandria Scrap,* 426 U.S. at 806, 96 S.Ct. at 2496 (in applying the market-participant doctrine, the Court noted that the state had not "interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation"); *Washington State Bldg. & Constr. Trades Council v. Spellman,* 684 F.2d 627 (9th Cir.1982) (concluding that state initiative cast in regulatory terms and imposing civil and criminal penalties failed to qualify under market-participant exception), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

■ In any event, even assuming that the cities in enacting the ordinances seek to engage in activity analogous to that of participants in the private sector, the court would still have to conclude that the market-participant doctrine does not apply: the ordinances impermissibly regulate outside the market in which the cities are actual participants. The doctrine permits a state or local government to influence "a discrete, identifiable class of economic activity in which [it] is a major participant," *White v. Massachusetts Coun-*

*cil,* 460 U.S. at 211 n. 7, 103 S.Ct. at 1046 n. 7, and "allows it to go no further." *South–Central Timber,* 467 U.S. at 97, 104 S.Ct. at 2245. It cannot impose conditions that "have substantial regulatory effect outside of [the] particular market" in which it participates. *Id.* Moreover, in determining whether an entity has impermissibly overreached its market, the court must define the market narrowly to include only the area of actual and substantial participation; otherwise, "the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry." *Id.* at 97–98, 104 S.Ct. at 2245–46.

The evidence indicates that, in the four-county region covered by the Authority, there are three distinct markets: the residential waste collection market, the commercial and industrial waste collection market, and the waste disposal services market. The defendants contend that Headland, Geneva, and Ozark have each entered the solid waste services markets as a market participant by adopting an ordinance that establishes a "system of service" for all three markets. These systems consist of the cities' sanitation divisions, private haulers and collectors, and the Authority's receiving facility for solid waste. By creating these systems of service, the defendants argue, the cities participate in every aspect of all three markets.

The evidence, however, does not support the defendants' characterization of the reach of the cities' actual market participation. Although Headland, Geneva, and Ozark have each established so-called "systems of service," they are not actively engaged in all three markets. First, for example, the three cities are not major participants in the waste disposal services market. It is the Authority, not the cities, that is constructing and financing the regional solid waste disposal facility. Admittedly, the Authority is direct-

ed by a 13–member board of directors nominated and elected by the 36 participating local governments; however, no one local government is able to direct the actions of the Authority. The Authority is therefore independent of the cities of Headland, Geneva, and Ozark. Moreover, the user contracts prohibit the cities from authorizing or approving any sites which would compete with the Authority. Thus, although the City of Headland currently owns a municipal landfill, under the terms of its user contract with the Authority, it will be prohibited from disposing of waste at its landfill.[7] Second, although Ozark will continue to collect residential waste generated within its borders and arrange for its disposal at the Authority, the city does not collect or transport commercial or industrial waste and there is no evidence that it intends to do so under the new ordinance. Private haulers will continue to collect, transport, and dispose of all commercial and industrial waste generated in Ozark. The ordinances therefore impermissibly reach outside the markets in which the cities participate.[8]

Moreover, in a sense, the three representative ordinances, in conjunction with the user contracts, reach even beyond the three markets. To the extent the ordinances prohibit private parties from disposing of solid waste out-of-state, the ordinances restrict this waste from becoming a part of the broader interstate market; and to the extent the ordinances set restrictions on who can collect waste and require that all waste collected be delivered to one place and to the extent that the user contracts prohibit the approval of competing disposal sites, the ordinances, in conjunction with the contracts, restrict outside private businesses from coming into the region and setting up competitive waste collection and disposal services. *Reeves, Inc. v. Stake,* 447 U.S. at 444, 100 S.Ct. at 2281 (in applying the market-participant doctrine, the Court noted that state has not "restricted the

---

7. The cities of Geneva and Ozark neither own landfill sites nor provide landfill services.

8. The defendants point out that several of the Authority's other participating local governments are more extensively engaged in the solid waste markets than are the cities of Headland, Geneva,

and Ozark. However, in this litigation, the court is concerned only with the actions of the cities whose ordinances are being challenged—the cities of Headland, Geneva, and Ozark. The actions of the Authority's other local governments are not at issue in this case.

ability of private firms or sister States to set up plants within its borders").

It is apparent from these observations that, in the telling language of the ordinances themselves, Headland, Geneva, and Ozark have each simply set up a "system of service" for "the storage, collection, transportation, and disposal and *regulation* of Solid Waste" across the markets. (Emphasis added). The primary purpose and effect of the systems is to control and regulate all of the solid waste markets, not participate in them.

 The city of Geneva has attempted to circumvent the limits of the market-participant doctrine by including in its flow control ordinance a provision "vesting title" in the city to all solid waste generated within its borders, with two exceptions.[9] The city believes that, by asserting title to all waste, it has established a proprietary interest in all waste within its borders and that, as a result, it can require private haulers to contract directly with the city to collect all commercial waste and direct all transactions involving this waste without regard to commerce clause restrictions. But Geneva cannot so easily evade the commerce clause. In *South–Central Timber*, the Supreme Court expressly condemned anticipated efforts by governments to evade the limitations of the

market-participant doctrine through provisions manipulating the vesting and passing of title. The Court responded to such attempts with the caution that "It is the substance of the transaction, rather than the label attached to it, that governs Commerce Clause analysis." 467 S.Ct. at 99 n. 11, 104 S.Ct. at 2246 n. 11. When the substance of Geneva's flow control ordinance is analyzed, it is clear that Geneva's actions are no different from those of Ozark and Headland.

First, as is evident from the language of the ordinances as well as the user contracts upon which they are based, all three cities are attempting to control and regulate the solid waste markets, not participate in them. Consistent with this goal, Geneva's primary concern throughout this litigation has been the disposition of solid waste, not the acquisition of title to the waste. The defendants state in their briefs that "solid waste is generally by definition abandoned or discarded material . . . universally regarded as a potential public nuisance," [10] and that "Waste haulers charge their customers a fee, in exchange for which they carry away something their customers most heartily do not want." [11] It is evident that, given this position toward solid waste as merely valueless material, the

---

9. The title vesting provision reads:
 "Section 2.02 TITLE TO WASTE. The City shall have vested title to all Acceptable Waste, except Acceptable Waste that is subject to disposition pursuant to the provisions of Sections 3.04(a) and 3.04(c) of this Ordinance, respectively, generated within its corporate limits."
 Section 3.04(a) provides that:
 "the owner or Person in possession of any household, business, industry or other property in the City may store, transport and dispose of Solid Waste generated, occurring or accumulating upon the premises of such owner or Person (not including, however, any Solid Waste previously collected by any such Person from the premises of others, notwithstanding that title to such Solid Waste may have been transferred to such Person) on his own land or otherwise, if such storage, transportation or disposal is accomplished pursuant to a certificate of exception obtained under the provisions of Section 22–27–3(g) of the *Code of Alabama 1975*, as amended, or any subsequent statute of similar import."
 And § 3.04(c) provides that:
 "any Acceptable Waste that is appropriately delivered or tendered to the Authority as herein provided and that the Authority does not

accept, process or otherwise dispose of, may thereafter be delivered and disposed of in any lawful manner deemed desirable by the franchised or contractually authorized Private Collector or Hauler or other Person collecting or transporting the same, it being understood and agreed that, for purposes of preceding portions of this clause (c), the Authority shall be considered not to have accepted, processed or otherwise disposed of any such Acceptable Waste only if (i) such Acceptable Waste shall have been duly and appropriately tendered to the Authority, in accordance with its rules and regulations, at an Authorized Receiving Facility and the Authority shall have rejected or *otherwise failed to accept it, or (ii) the Authority* shall have published in a newspaper having general circulation in the City or surrounding area a notice to the effect that it cannot accept Acceptable Waste and shall not have revoked or otherwise withdrawn (by notice published in like manner) such notice."

10. Defendants' brief filed on February 12, 1993, at 6.

11. *Id.* at 10.

only reason Geneva is claiming title to the waste is pretextual. The claim is an attempt to evade the strictures of the commerce clause, not to acquire title in any meaningful sense. Geneva has merely added a different label to it actions. This is not to say that discarded solid waste might not have value and that a government might never want to claim title to it. However, in this case, the court is convinced and so finds that Geneva has not placed such value on it, nor has the city sought bona fide ownership of the waste within its borders.

Second, that this is true is reinforced by a reading of one of the exceptions to the title vesting provision. The exception provides that title does not vest in solid waste delivered to the Authority but not accepted by it.[12] Thus, whether title vests in the city cannot be determined until after the waste is delivered to the Authority and until after the Authority has either accepted or rejected it. This exception reveals that the whole notion of vested title is a fakery and a pretext for requiring that all private waste collectors deliver waste to the Authority.

Even if Geneva could validly claim title to all waste produced within its borders, its proprietary interest would terminate once it transferred the waste to private haulers for collection. Whether one characterizes the business arrangements between the city of Geneva and private haulers as "purchases" of transportation and disposal services or as "sales" of garbage does not make any difference. The commerce clause imposes the same constraints on Geneva's ability to regulate these transactions. *Fort Gratiot*, —— U.S. at ——, 112 S.Ct. at 2023. Although a municipality may freely exercise its discretion as to those parties with which it will deal, *White v. Massachusetts Council*, 460 U.S. at 207 n. 3, 103 S.Ct. at 1044 n. 3, the market-participant doctrine is not "*carte blanche* to impose any conditions that the [municipality] has the economic power to dictate, and does not validate any requirement merely because the [municipality] imposes it upon someone with whom it is in contractual privity." *South–Central Timber*, 467 U.S. at

97, 104 S.Ct. at 2245. For example, as stated, a municipality cannot impose contractual conditions that have a substantial regulatory effect outside the market in which it participates. *Id.* at 97 & n. 10, 104 S.Ct. at 2245–46 & n. 10. Thus, any attempt to attach conditions to the disposal of waste once it came to rest in private hands would be an impermissible "downstream restriction" outside of the market in which it participates. *Id.* at 98–99, 104 S.Ct. at 2246.

Geneva attempts to convince the court that its proprietary interest would not terminate if, conceivably, it leased someone else to deliver the waste but retained ownership of the waste. However, upon deeper analysis, this argument does not support the city's claim to title in the solid waste but rather lays bear the city's true intent: that regulation and control rather than ownership of the waste is the "substance of the transaction." *South–Central Timber*, 467 S.Ct. at 99 n. 11, 104 S.Ct. at 2246 n. 11. The only reason the city gives for wanting to retain ownership in these circumstances is so that the waste could be hauled to a landfill "in which it holds an interest, to a landfill which belongs to local interests, or to whichever landfill it may desire"—that is, to the Authority.[13] Geneva seeks no benefit from its ownership of the waste other than to regulate and control how it is disposed of downstream and, in particular, to dictate to private haulers that they must take their waste to the Authority. Indeed, as the previously discussed exception to the title vesting provision makes clear, the title vesting terminology in the city's ordinance provides for only feigned ownership. Geneva's claim to ownership of solid waste generated within its borders is, therefore, nothing but a deceptive cloak lowered to evade commerce clause restraints on the city's efforts to regulate how others will dispose of waste generated within the city.

■ Finally, the defendants suggest that their argument that the cities are market participants and not market regulators is supported by legislative findings accompanying the mandate that every Alabama county

---

12. *See* note 9, *supra.*

13. Defendants' brief filed on February 12, 1993, at 11.

and municipality adopt a comprehensive solid waste management plan. Admittedly, the state legislature stated that "state or local governments, by creating and operating solid waste management facilities are *participants* in the solid waste facility services market and have entered that market for the purpose of serving the citizens of this state." 1975 Ala. Code § 22–27–40(12) (1990 & Supp.1992) (emphasis added). But mere recitation of a legislative finding is not enough to establish the cities as private market participants. The actual activities of the cities must be examined to determine their status either as either market participants or market regulators. The court has done that here and found that the cities of Headland, Geneva, and Ozark are not market participants immune from commerce clause scrutiny.[14]

### B.

As previously stated, the commerce clause prohibits states and their local governments from taking actions that interfere with the free flow of trade among the states unless the interference is demonstrably justified by a valid factor unrelated to economic protectionism. *Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2023–24. Solid waste is "commerce" within the meaning of the commerce clause, *id.,* and is thus subject to the clause's restrictions on a state's ability to regulate commercial transportation of it *out* of the state as well as *into* the state. *Id.*

### 1.

■ The court agrees with the plaintiffs that the Headland and Geneva flow control ordinances impermissibly interfere with and discriminate against interstate trade by prohibiting the plaintiffs from collecting and disposing of solid waste out of the four-county area, including out-of-state. First and most compelling, the user contracts, upon which

the ordinances are based, expressly reflect that the intended effect of the ordinances is pure economic protectionism. The contracts, in a provision previously set out, candidly provide that the intended effect of the ordinances is to assure the Authority's economic success by keeping locally generated solid waste out of interstate commerce and within the local area, and thus provide a steady and adequate supply for the Authority.[15] The Supreme Court has consistently struck down laws based on such local economic protectionism.

In *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), the Supreme Court held that a New Jersey law which prohibited the importation of most "solid waste" in order to reduce waste disposal costs and to protect the environment violated the commerce clause. The Court stated that it "has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 522–524, 55 S.Ct. 497, 500–501, 79 L.Ed. 1032; or to create jobs by keeping industry within the State, *Foster–Fountain Packing Co. v. Haydel,* 278 U.S. 1, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147; *Johnson v. Haydel,* 278 U.S. 16, 49 S.Ct. 6, 73 L.Ed. 155; *Toomer v. Witsell,* 334 U.S. 385, 403–404, 68 S.Ct. 1156, 1165–1166, 92 L.Ed. 1460; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, *Edwards v. California,* 314 U.S. 160, 173–174, 62 S.Ct. 164, 166–167, 86 L.Ed. 119," *Philadelphia v. New Jersey,* 437 U.S. at 627, 98 S.Ct. at 2537. "In each of these cases," the Court continued, "a presumably legitimate goal was sought to be achieved by the illegitimate means of isolat-

---

14. Because the court does not reach the question of the constitutionality of the user contracts between the Authority and its participating local governments, the court need not resolve at this time whether the Authority may be considered a market participant.

15. The user contracts on which the ordinances are based also discriminate against interstate commerce in another way: they prohibit the

cities from authorizing and approving competing disposal sites. Although there is no evidence that this restriction has hindered the plaintiffs— that is, the plaintiffs have not indicated that they intend to construct any competing site in the four-county area—the presence of the restriction reinforces the court's conclusion that the true purpose behind the ordinances is to assure the Authority's economic success.

ing the State from the national economy." *Id.*

More recently, in *Wyoming v. Oklahoma*, —— U.S. ——, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), Wyoming leveled a commerce clause challenge against Oklahoma legislation requiring that Oklahoma coal-fired electric generating plants producing power for sale in Oklahoma burn a mixture of coal containing at least 10% Oklahoma-mined coal. The Supreme Court rejected Oklahoma's plea that its "discrimination against out-of-state coal is justified because sustaining the Oklahoma coal-mining industry lessens the State's reliance on a single source of coal." —— U.S. at ——, 112 S.Ct. at 801. And finally and most recently, in *Fort Gratiot*, the Supreme Court struck down a state statute which sought to regulate intercounty commerce in solid waste by prohibiting private landfill facilities from accepting waste that originates outside the county in which the facilities are located. —— U.S. at ——, 112 S.Ct. at 2026–28. The state sought to "authorize each of its 83 counties to isolate itself from the national economy" by "afford[ing] local waste producers complete protection from competition from out-of-state waste producers who seek to use local waste disposal areas." *Id.* at ——, 112 S.Ct. at 2024.

Headland and Geneva seek essentially the same impermissible protection from competition sought in *Fort Gratiot* and the other cases discussed above. The defendants nevertheless attempt to circumvent the two ordinances' obvious discrimination by advancing the argument that, because the two ordinances do not expressly say that solid waste cannot be taken out-of-state for disposal, they do not discriminate against interstate commerce on their face; the ordinances, the defendants argue, simply require that solid waste generated within certain jurisdictions be taken to the Authority's facility. The defendants' argument is a semantical sleight of hand. By expressly limiting the disposal of waste to the Authority's facility, the ordinances have at the same time prohibited disposal outside the state of Alabama. In any event, state conduct may discriminate interstate commerce "either on its face or in practical effect." *Hughes v. Oklahoma*, 441

U.S. at 336, 99 S.Ct. at 1736. Therefore, although the ordinances may not expressly say that solid waste cannot be taken out of the state, their effect is to prohibit such. The purported neutrality of the language of the Headland and Geneva ordinances does not prevent them from being discriminatory.

The defendants further maintain that the Headland and Geneva ordinances are not discriminatory because they place restrictions on the intrastate disposal of solid waste, as well as on out-of-state disposal. In *Fort Gratiot*, the Supreme Court invalidated a Michigan statute that prohibited private landfill operators from accepting solid waste originating outside the county in which their facilities were located. The Court found that the statute facially discriminated against interstate commerce even though it purported to regulate intercounty commerce and did not treat out-of-county waste any differently from waste from other states. The Court wrote that "A State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself." —— U.S. at ——, 112 S.Ct. at 2024. The Court explained that the state sought to "authorize each of its 83 counties to isolate itself from the national economy" by "afford[ing] local waste producers complete protection from competition from out-of-state waste producers who seek to use local waste disposal areas." *Id.* See also *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *Brimmer v. Rebman*, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862 (1891).

■ The Geneva and Headland ordinances similarly discriminate against interstate commerce. The fact that they also affect the intrastate transport of waste does not mitigate their burden on interstate commerce nor eliminate their discriminatory nature. *Fort Gratiot*, —— U.S. at ——, 112 S.Ct. at 2025. As with the Michigan statute, the ordinances allow the cities to isolate themselves from the national economy in violation of the commerce clause. *Id.* See also *Waste Systems Corp. v. County of Martin*, 985 F.2d 1381 (8th Cir.1993) (holding county ordi-

nances requiring all solid waste to be disposed of at county facilities to violate commerce clause); *Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Management Corp.,* 770 F.Supp. 775 (D.R.I. 1991) (enjoining state regulation requiring all solid waste originating or collected in-state to be disposed of at state-licensed facilities), *aff'd,* 947 F.2d 1004 (1st Cir.1991) (per curiam).

[10] The Ozark flow control ordinance differs from the Headland and Geneva ordinances in that it purports to allow some waste to be disposed of out-of-state. The court, however, again agrees with plaintiffs that the Ozark reporting requirements on out-of-state disposal have the practical effect of discriminating against the interstate transport of solid waste. Under the ordinance, any person transporting waste out-of-state must comply with five requirements. In a sworn statement, he must report each month: the daily total amount of solid waste collected, in tons or fractions of tons; the location and daily amount collected from each customer, in tons or fractions of tons; the location outside the state to which the solid waste was transported for disposal or transshipment; and the routes by which the solid waste was transported to those locations. The hauler must also submit supporting documents along with his report.

Waste hauled in-state to the Authority's facility is not subject to these reporting requirements. Also, contrary to defendants' assertions, comparable administrative burdens are not placed on waste hauled in-state. The Ozark ordinance provides that private collectors disposing of solid waste at the Authority's facility must comply with the Authority's rules and regulations, but the records required of those using the Authority's facility are not comparable to those imposed on collectors hauling out-of-state. Moreover, most of the Authority's regulations are directed to the participating local governments, not to private collectors of waste, and the local governments are required to submit only readily accessible information regarding the vehicles used and the area of collection. Tonnage information is requested only when waste from more than one municipality is delivered to the Authority in the same vehicle. Specific tonnage information for each customer is not required nor are total tonnage amounts. Supporting documentation of waste collection is also not required.

The Ozark ordinance therefore expressly differentiates between waste transported in-state and waste transported out-of-state, and it does so in a way that discriminates against interstate commerce. The court is convinced, and so finds, that the requirements imposed on waste hauled out-of-state will be difficult, if not impossible, to meet. For example, the ordinance requires haulers who take waste out-of-state to specify the amount collected from each customer in tons or fractions of tons. But because collection trucks are not equipped with scales, current industry practice is to estimate collection amounts according to volumes of waste, not tonnage. Tonnage information is available only when the truck is weighed at the landfill. Therefore, it will be very difficult for haulers to provide specific tonnage information for each customer. The ordinances will also be time-consuming and costly to comply with. In addition to requiring a sworn statement, the ordinances request highly detailed information and documentation that will impose increased bookkeeping and administrative burdens on out-of-state haulers.

The requirements of the Ozark ordinance pose a virtually insurmountable barrier to the out-of-state transport of waste and discriminate against interstate commerce in violation of the commerce clause. *See Southern States Landfill v. Georgia Dep't of Natural Resources,* 801 F.Supp. 725 (M.D.Ga.1992); *Gov't Suppliers Consolid. Serv. v. Bayh,* 753 F.Supp. 739, 777–79 (S.D.Ind.1990). In practical effect, therefore, the ordinance is no different from the Geneva and Headland ordinances. Each locks solid waste within a four-county area and prevents the out-of-state transport of solid waste. That all three ordinances have the same effect is not surprising: all three are based on the same user contract which expressly mandates that all solid waste collected within their boundaries by public or private collectors be delivered to the Authority's facility only; and all three reaffirm this mandate in their preambles which provide, in part, that the purpose of

the ordinances is to provide an adequate supply of solid waste to the Authority. The Headland and Geneva ordinances ·comply with this mandate directly, and the Ozark ordinance does so indirectly. The reporting requirements in the Ozark ordinance are nothing more than pretextual. Therefore, for the same reasons that the Headland and Geneva ordinances discriminate against interstate commerce, the Ozark ordinance does so as well.[16]

To discount the effects of the Headland, Geneva, and Ozark ordinances on interstate commerce, the defendants point to several exceptions to the requirement that all waste generated and collected within certain jurisdictions be disposed of at the Authority's facility. For example, the ordinances grandfather existing contracts and exempt recycling. The defendants' argument is not persuasive. "The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce." *Wyoming v. Oklahoma,* —— U.S. at ——, 112 S.Ct. at 801 (emphasis in original). *See also New Energy Co. v. Limbach,* 486 U.S. 269, 276, 108 S.Ct. 1803, 1809, 100 L.Ed.2d 302 (1988) ("Our cases ... indicate that where discrimination is patent ... neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be

shown"). The exceptions to the ordinances only reduce the scope of the discrimination; they do not eliminate it. *Fort Gratiot,* —— U.S. at ——, 112 S.Ct. ·at 2025.[17]

2.

■ Because the Headland, Geneva, and Ozark ordinances discriminate against interstate commerce on their face and in practical effect, the burden shifts to the defendants to justify the discrimination for reasons unrelated to economic protectionism, *Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2023–24; a "virtually per se rule of invalidity" applies to statutes and regulations that amount to simple economic protectionism, *Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2535. To meet their burden, the defendants must justify the discrimination "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). In addition, direct discrimination against interstate commerce—as is the case with the Headland, Geneva, and Ozark ordinances—invokes at a minimum the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives. *Chemical Waste Management, Inc. v. Hunt,* —— U.S. ——, ——, 112 S.Ct. 2009, 2014 (1992).[18] The defendants

---

**16.** The plaintiffs argue that, even if the Ozark ordinance's reporting requirements could be viewed as permissibly reasonable, the ordinance would still discriminate against interstate commerce. Under the ordinance, waste which is not taken to the Authority must be·taken out-of-state. As a result, for example, the facility now being developed by Brundidge Waste Disposal Center and Durjac Twelve could not receive solid waste from those haulers who did not want to take their waste to the Authority; these haulers would have to take their waste out-of-state. The effect and intent of the Ozark ordinance is that private landfill operators located within the state could not accept solid waste generated within the city but that private landfill operators located outside the state could. Similarly, haulers could not take their waste to private landfill operators located within the state but could take it to those located outside the state. The court does not reach whether the Ozark ordinance would impermissibly impede the flow of solid waste in interstate commerce in the event that the reporting requirements were permissible under the commerce clause.

**17.** Indeed, the court is convinced that some of the exceptions would not even reduce the scope of discrimination. The evidence reflects that the recycling exemption will have little effect in preserving interstate commerce because of the economic realities of the recycling business. Recycling is built around an integrated set of operations that include the collection, transfer, transport, and disposal of solid waste. The flow control ordinances, however, would dismantle several of these components.

**18.** In some circumstances, a more flexible approach is taken in evaluating state and local economic regulation under the Commerce Clause. "When ... a statute has only indirect effects on interstate commerce and regulates evenhandedly," the test is "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). In such cases, the statute will be upheld unless "the

must therefore identify interests, other than local economic protectionism, and show how the ordinances serve those interests. The defendants have failed to meet this test.

As already shown, the expressed intended effect of the user contracts upon which the three ordinances are based is pure economic protectionism: to provide a sure source of income for the Authority by keeping locally generated solid waste out of interstate commerce and within the local area. The defendants attempt to salvage the three ordinances by offering other justifications which they contend are independent of the parochially economic one expressed in the user contracts. The defendants maintain that the ordinances are part of a comprehensive long-term effort to deal with the health, safety, and environmental problems associated with solid waste disposal. The measures, the defendants argue, support the legitimate public purpose of ensuring a steady waste stream by creating an infrastructure of public facilities for the transportation and disposal of waste. The defendants press that, if they are to meet their long-term waste management goals, there are no viable alternatives to the construction of a publicly owned regional waste disposal facility and no means of financing the project other than with flow control ordinances.

▬▬▬▬ The defendants' interest in pursuing a comprehensive long-term plan for the management of solid waste is a legitimate local purpose. *Stephen D. DeVito, Jr. Trucking,* 770 F.Supp. at 785. However, a presumably legitimate and necessary goal cannot be achieved by illegitimate and unnecessary means. *Philadelphia v. New Jersey,* 437 U.S. at 626–27, 98 S.Ct. at 2536–37.

First, the defendants have failed to show why the construction of a new regional facility requires a total ban on interstate commerce. A number of other options are available. The defendants could finance the project through directs loans from local banks, the method used for the project's interim financing. Alternatively, the counties involved in the Authority could help finance the project by issuing warrants secured by their full faith and credit, a financing strategy specifically authorized by Alabama's Solid Wastes Disposal Act to assist in the acquisition of solid waste collection and disposal facilities.[19] The defendants could also proceed with their plan to build a new facility, charge competitive rates, and have the local governments supplement any shortfall. In other words, rather than creating a financially independent facility, the defendants could continue their current practice of subsidizing the cost of waste disposal. Additional alternatives include financing the project through private investors, ad valorem taxes, or utility bill assessments.

Second, even assuming that the only way to finance adequately a public regional landfill is to protect the facility from all interstate competition, the defendants have not sufficiently explained why the health and safety needs of their communities can be satisfied only by the construction of such a facility— that is, one with such direct and substantial adverse effects on interstate commerce. Cost, not health and safety, considerations appear to have dominated the decision to construct a new facility. Contrary to defendants' assertions, the evidence indicates that a number of alternative waste disposal sites are available to the cities of Headland, Gene-

---

burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

The defendants argue that this more flexible balancing approach should be applied in this case. But as the Supreme Court recently reiterated, "this lesser scrutiny is only available 'where other legislative objectives are credibly advanced *and* there is *no* patent discrimination against interstate trade.'" *Chemical Waste Management,* —— U.S. at —— n. 5, 112 S.Ct. at 2014 n. 5, quoting *Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2535 (emphasis added). Al-

though there is "no clear line" that separates close cases on which scrutiny should apply, *Brown–Forman Distillers,* 476 U.S. at 579, 106 S.Ct. at 2084, this is not a close case. The court cannot say that the "effects upon interstate commerce are only incidental," *Pike,* 397 U.S. at 142, 90 S.Ct. at 847, where, as in this case, the ordinances "overtly block[ ] the flow of interstate commerce." *Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2535.

19. The act provides that counties have the power to issue and sell warrants for the purpose of financing solid waste disposal facilities. 1975 Ala.Code §§ 22–27–22 to –27 (1990).

va, and Ozark, all of which would be subject to the same health and safety regulations as the proposed regional facility and which would not require the cities to devise measures that discriminate against interstate commerce. The defendants respond that establishing their own facility will lessen the cities' reliance on others in the area of waste disposal.[20] This response is foreclosed by the Supreme Court's recent decision in *Wyoming v. Oklahoma.* There, Wyoming challenged under the commerce clause Oklahoma legislation requiring that Oklahoma coal-fired electric generating plants producing power for sale in Oklahoma burn a mixture of coal containing at least 10% Oklahoma-mined coal. Oklahoma argued that its "discrimination against out-of-state coal is justified because sustaining the Oklahoma coal-mining industry lessens the State's reliance on a single source of coal." ―― U.S. at ――, 112 S.Ct. at 801. The Court summarily rejected the argument, citing *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

■ The defendants also contend that the ordinances' restrictions on the interstate flow of waste will serve the legitimate local purpose of curbing illegal dumping. The court agrees that the cities have an interest in preventing illegal dumping of solid waste within their borders. However, the court is convinced that, if anything, the cities "increase[ ] the risk that waste will be disposed of improperly within [their boundaries] by preventing any waste from being exported." *Stephen D. DeVito, Jr. Trucking,* 770 F.Supp. at 784. In any event, the credible evidence does not support the defendants' contention that such restrictions are necessary to curb illegal dumping.

■ The defendants further maintain that the operation of their own waste disposal facility will help them to avoid potential liability for cleanup costs at landfill sites. This argument, however, is without merit for two reasons. First, defendants' concern regarding their potential liability for cleanup costs rests primarily on the case of *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2nd Cir.1992). But the ruling in *B.F. Goodrich Co.* is inapplicable to this case. There, the Second Circuit Court of Appeals held that municipalities that arrange for the disposal of *hazardous substances* may be held liable for the costs of landfill cleanups under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.[21] This case, however, centers on the collection and disposal of non-hazardous solid waste. Indeed, the ordinances make clear that the Authority plans to accept only non-hazardous solid waste. Second, there is no evidence to suggest that only the defendants can assure that solid waste will be disposed of in a safe manner. As noted previously, alternative waste disposal sites are available, which are subject to the same health and safety regulations as the proposed regional facility.

■ Finally, the defendants offer separate reasons to support the reporting requirements in the Ozark ordinance. First, they contend that the requirements are needed to verify that solid waste not delivered to the Authority is actually taken out-of-state. The defendants have not, however, imposed similar verification requirements on waste to be delivered to the Authority. Nor have they presented any legitimate reason why they must assure that waste taken out-of-state is taken to its proposed destination, when they do not require similar assurances of waste routed for in-state disposal. The defendants have failed to identify any local benefit that results from the verification procedures imposed on out-of-state disposal. Second, the defendants maintain that the requirements assure that Ozark has available adequate information to comply with anticipated state requirements regarding waste reduction and recycling. However, the

---

20. Under Alabama law, municipalities can usually contract with private companies for public services for terms of only three years. 1975 Ala.Code § 41–16–57(e) (1991). However, local governments are authorized to enter into contracts with regional solid waste authorities for terms as long as 45 years. 1975 Ala.Code § 11–89–A–15(b) (1985 & Supp.1992).

21. 42 U.S.C.A. §§ 9601–9675 (West 1983 & Supp.1992), as amended.

Ozark ordinance does not require comparable information regarding in-state waste disposal, and defendants have not provided any legitimate reason for distinguishing between in-state and out-of-state disposal in this regard. Moreover, the evidence indicates that the scope of the Ozark requirements is far beyond that which the state will require. The state is interested only in overall solid waste *volumes*, not in the highly specific *tonnage* figures required by the Ozark ordinance. The state also has no interest in the sworn statements, customer, and route information required by the ordinance. Ozark, therefore, could receive the necessary information through much less stringent and, more importantly, non-discriminatory reporting requirements. All Ozark need require is the total volume of waste transported out-of-state. This information would be readily accessible and would eliminate the excessive administrative burdens present in the current requirements. Rather than serving any legitimate purpose, the underlying thrust of the requirements is to make out-of-state waste disposal a more costly, less efficient, and less attractive option. Indeed, in light of the language in the underlying user contract as well as in the preamble to the Ozark ordinance itself—that the purpose behind the ordinance is to assure that all waste is delivered to the Authority's facility—it is apparent that the requirements are really a pretext for local economic protectionism.

### III.

In conclusion, it is evident that the purpose and effect of the three representative flow control ordinances is to finance the Authority by isolating and thus insulating its four-county region from the rough and tumble of interstate commerce and the economic competition that comes with it. As the Supreme Court has repeatedly held, the commerce clause does not countenance such local economic protectionism. The Authority and its 36 participating local governments must choose other means to assure the Authority's financial success.[22]

An appropriate judgment finding that the Headland, Geneva, and Ozark ordinances violate the commerce clause will be entered.

### JUDGMENT

In accordance with the memorandum opinion entered this day, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is entered in favor of the plaintiffs—Waste Recycling, Inc., Waste Away Group, Inc., Waste Away, Inc., Brundidge Waste Disposal Center, Inc., and Durjac Twelve, Inc.—and against the defendants—Southeast Alabama Solid Waste Disposal Authority and the cities of Headland, Geneva, and Ozark; and

(2) That it is the DECLARATION of the court that the representative ordinances passed by defendants Headland, Geneva, and Ozark pursuant to the user contracts with defendant Southeast Alabama Solid Waste Disposal Authority for the collection and disposal of solid waste violate the commerce clause in the United States Constitution.

It is further ORDERED that costs are taxed against the defendants—Southeast Alabama Solid Waste Disposal Authority and the cities of Headland, Geneva, and Ozark—for which execution may issue.

---

**22.** The defendants hypothetically question whether it would violate the commerce clause if a single municipality completely occupied the collection and disposal of solid waste within its boundaries—that is, the city collected and disposed of all solid waste at its own landfill, and prohibited any participation by private parties. Because this is not the scenario presented in this case, the court need not reach this difficult question. Here, the parties have defined the issues as whether the cities are participants in or regulators of *private* markets and, if the latter, whether their regulation of these *private* markets violates the commerce clause; the issue is not whether the cities have *nationalized* the markets within their boundaries. Throughout this litigation, Headland, Geneva, and Ozark have not maintained that they have *nationalized* the markets within their boundaries, but rather have advanced the contrary argument that they have entered the *private* solid waste markets as private participants rather than regulators. And any later effort to recharacterize the cities' challenge would be disingenuous.